Scott **ARMSTRONG**, et al., Appellees,

v.

George **BUSH**, et al., Appellants.

No. 90–5173.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 1990.

Decided Jan. 25, 1991.

Patricia M. Bryan, Deputy Asst. Atty. Gen., with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Leonard Schaitman, Freddi Lipstein and Matthew M. Collette, Attys., Dept. of Justice, were on the brief, for appellants.

Alan B. Morrison, with whom Michael E. Tankersley, Patti A. Goldman and Kate Martin were on the brief, for appellees.

Before WALD, D.H. GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Plaintiffs-appellees, journalist Scott Armstrong, the National Security Archive, and several other individuals and organizations, brought suit to prohibit defendants-appel-lants President George Bush, Archivist of the United States Don Wilson, and the National Security Council ("NSC") from erasing any material stored on the NSC computer system during the last two weeks of the Reagan Administration. Appellees allege that some of these materials are "records" within the meaning of the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201 *et seq.*, and the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–2118, 2901–2910, 3101–3107, and 3301–3324, and, therefore, cannot be erased without the approval of the Archivist. The district court held that § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, authorized review of the President's and NSC's compliance with the PRA and the FRA and that there are unresolved factual issues regarding whether the appellants have complied with the recordkeeping statutes. *Armstrong v. Bush*, 721 F.Supp. 343 (D.D.C.1989). Accordingly, the district court denied appellants' motion to dismiss the complaint or, in the alternative, for summary judgment.

The district court subsequently certified its order for interlocutory appeal under 28 U.S.C. § 1292(b), and this court granted appellants' petition for permission to take an interlocutory appeal. We now reverse in part, affirm in part, and remand to the district court for proceedings consistent with this opinion.

I. BACKGROUND

A. *The Statutory Framework*

1. The Federal Records Act

The FRA governs the creation, management and disposal of federal records.[1] In enacting the FRA, Congress sought to ensure *inter alia:* (1) "efficient and effective records management"; (2) "[a]ccurate and complete documentation of the policies and transactions of the Federal Government"; and (3) "[j]udicious preservation and dispos-

---

1. The FRA is actually a series of statutes, which originated with the Federal Records Act of 1950, ch. 849, 64 Stat. 583, and the 1943 Disposal of Records Act, ch. 192, 57 Stat. 380. These acts were subsequently amended by the Government Records Disposal Amendments of 1970, 84 Stat. 320, the Federal Records Management Amendments of 1976, 90 Stat. 2723, and the National Archives and Records Administration Act of 1984, 98 Stat. 2280. *See* 44 U.S.C. §§ 2101 *et seq.*, 2901 *et seq.*, 3101 *et seq.*, 3301 *et seq.*

al of records." 44 U.S.C. § 2902. Accordingly, the FRA requires "[t]he head of each Federal agency [to] make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency...." *Id.* § 3101. Each agency head shall also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," *id.* § 3102, and "shall establish safeguards against the removal or loss of records he determines to be necessary and required by regulations of the Archivist." *Id.* § 3105.

The FRA also mandates that "[t]he Archivist shall provide guidance and assistance to Federal agencies," 44 U.S.C. § 2904(a), shall "promulgate standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1), and shall "conduct inspections or surveys of the records and records management programs and practices within and between Federal agencies." *Id.* § 2904(c)(7). If the Archivist discovers that any provision of the FRA

> has been or is being violated, the Archivist shall (1) inform in writing the head of the agency concerned of the violation and make recommendations for its corrections; and (2) unless satisfactory corrective measures are inaugurated within a reasonable time, submit a written report of the matter to the President and Congress.

*Id.* § 2115(b).

The FRA similarly regulates the disposal of "records," which it defines to include

> all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency ... as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Govern-

ment or because of the informational value of the data in them.

44 U.S.C. § 3301. No records may be "alienated or destroyed" except pursuant to the disposal provisions of the FRA. *Id.* § 3314. The Archivist plays a key role in the disposal of records. Upon the request of an agency head, the Archivist may authorize the disposal of records that are no longer needed by the agency and that do not have "sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government...." *Id.* § 3303a. In addition, the Archivist

> shall notify the head of a Federal agency of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency that shall come to his attention, and assist the head of the agency in initiating action through the Attorney General for the recovery of records wrongfully removed and for other redress provided by law.

*Id.* § 2905(a); *see also id.* § 3106 (providing that each agency head shall notify the Archivist of any unlawful removal or destruction of records and shall initiate, through the Attorney General, an action to recover the records). If, however, the agency head does not initiate an action, the Archivist "shall request the Attorney General to initiate such action, and shall notify the Congress when such a request has been made." *Id.* § 2905(a).

### 2. The Presidential Records Act

The PRA directs the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records...." 44 U.S.C. § 2203. The statute defines "Presidential records" as

> documentary materials ... created or received by the President, his immediate staff, or a unit or individual in the Executive Office of the President whose function is to advise and assist the President,

in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(2).

Like the FRA, the PRA also regulates the disposal of presidential records. "During his term of office, the President may dispose of those of his Presidential records that no longer have administrative, historical, informational, or evidentiary value." *Id.* § 2203(c). If the Archivist thinks it advisable, he may notify Congress of the President's intent to dispose of the records; and if the Archivist notifies Congress, the President must submit the disposal schedules to the appropriate congressional committees and wait sixty days before destroying the records. *Id.* §§ 2203(c), 2203(d). The PRA gives neither the Archivist nor the Congress the authority to veto the President's decision to destroy the records.

Somewhat different disposal provisions apply after the President has left office. Upon the conclusion of the President's term of office, the Archivist assumes control of the presidential records and, after giving notice in the Federal Register, may dispose of the records that have "insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation." 44 U.S.C. §§ 2203(f)(1), (f)(3). "Publication of such notice shall constitute a final agency action" for purposes of judicial review under the APA. *Id.* § 2203(f)(3).

## B. *This Action*

Plaintiffs-appellees allege that defendants-appellants intend to delete material from the White House computer systems in violation of the FRA and the PRA.[2] Several components of the Executive Office of the President ("EOP"), including the NSC, utilize the "PROFS" computer system, "an inter-computer communications system marketed by the IBM Corporation." *Armstrong*, 721 F.Supp. at 345. EOP and NSC staff use the PROFS system to create and send to other staff connected to the system three types of documents: "(1) short 'notes' or 'mail'; (2) larger documents, which the recipients can revise; and (3) individual calendars." *Id.* Both the sender and recipient can make a hard-copy printout of a PROFS document or delete the document from their PROFS files. If both the sender and recipient delete the document from their PROFS files, the document is deleted from the PROFS system; unless a hard-copy printout was made, "it is possible that no record would exist of its ever having been created." *Id.*

The disputed material in this case consists of computer "backup" tapes compiled pursuant to the normal EOP and NSC backup procedure. Each Saturday night the NSC makes a backup tape that records all the information on the PROFS system at the time the tape is made. The NSC keeps these backup tapes for two weeks before erasing their contents and recycling them. *Id.* Other components of the EOP make nightly backup tapes and keep the tapes for two to six weeks before recycling. *Id.*

On January 19, 1989—the last day of the Reagan Administration—the National Security Archive filed three Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests for copies of all information stored on the PROFS computer system in the EOP and NSC from its date of installation in 1985 until the end of the Reagan Administration. *Armstrong*, 721 F.Supp. at 347. Later that day, plaintiffs sued the President, the Vice President,[3] the NSC,

---

**2.** Because the various components of the Executive Office of the President ("EOP") perform different functions, they create different kinds of records. The President, the Office of Vice President, and the components of the EOP whose sole responsibility is to advise the President are subject to the PRA and create "presidential records." The components of the EOP that have statutory responsibility (such as the Office of Management and Budget and Council on Environmental Quality) are subject to the FRA and create "federal records." Because NSC advises the President and has statutory obligations, it creates both presidential and federal records.

**3.** Plaintiffs initially sued Ronald Reagan in his capacity as President and George Bush in his capacity as Vice President and President-elect. Complaint for Declaratory and Injunctive Relief

and the Archivist seeking a declaration that many of the documents stored in the PROFS system at the close of the Administration are federal and presidential records. *Id.* Plaintiffs also sought an injunction prohibiting the destruction of these documents and directing the President and NSC to classify and preserve the documents as required by the FRA and PRA. *Id.* Finally, plaintiffs sought an order requiring the Archivist to carry out his responsibilities under the two statutes. *Id.*

The district court initially issued a Temporary Restraining Order, enjoining defendants-appellants from destroying or altering the PROFS computer tapes or backup files. Appellants agreed to preserve the backup tapes pending resolution of this case and moved to dismiss the complaint or, in the alternative, for summary judgment. *Id.* at 348. The district court denied both motions, holding that: (1) although the PRA does not expressly provide for judicial review of the President's implementation of the statute, the plaintiffs may obtain judicial review under the APA because the President is an "agency" within the meaning of 5 U.S.C. § 701(b)(1); (2) presidential action under the PRA is not "committed to agency discretion by law" under § 701(a)(2) of the APA; and (3) there exists a genuine dispute of material fact about whether the material on the PROFS tapes qualifies as presidential or agency records and whether defendants' implementation of the FRA and PRA was "arbitrary and capricious" under § 706(2) of the APA. *Id.*

Appellants challenge each of these holdings. They also argue against the justiciability of the action, contending that: (1) plaintiffs do not have standing because they are not within the zone of interests of the records creation provisions of the FRA and PRA; (2) the PRA claims are not reviewable under the APA because the PRA precludes judicial review; and (3) the FRA claims are not reviewable under the APA because the FRA precludes judicial review of an agency's records creation decisions

and the question of what constitutes a record is committed to agency discretion by law. We address each of these issues in turn.

## II. STANDING

In order to have standing under the APA, plaintiffs must satisfy the "zone of interests" test. That is, "the interest sought to be protected by the [plaintiffs must be] arguably within the zone of interests to be regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *see also Clarke v. Securities Industry Association,* 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987). In this case, appellants contend that the plaintiffs are not within the zone of interests of the records creation and management provisions of the PRA and FRA. We disagree. We find that the statutory language and legislative history of both statutes indicate that one of the reasons that Congress mandated the creation and preservation of federal and presidential records was to ensure that private researchers and historians would have access to the documentary history of the federal government.

Congress enacted the PRA "to insure the preservation of and public access to the official records of the President." Presidential Records Act of 1978, Pub.L. No. 95–591, 1978 U.S. CODE CONG. & ADMIN. NEWS (92 Stat.); *see also* H.Rep. No. 95–1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5732, 5733. The FRA, enacted to ensure the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," 44 U.S.C. § 2902(1), evinces a similar congressional intent. As we concluded in *American Friends Service Committee v. Webster,* 720 F.2d 29, 57 (D.C.Cir.1983), "the legislative history of the [FRA] supports a finding that Congress

---

¶¶ 9–10. Plaintiffs subsequently amended their complaint, dropping their claim against President Reagan and naming George Bush in his

capacity as President. Amended Complaint for Declaratory and Injunctive Relief ¶ 11.

intended, expected, and positively desired private researchers and private parties whose rights may have been affected by government actions to have access to the documentary history of the federal government."

Appellants attempt to distinguish *American Friends*, in which private researchers were held to be within the zone of interests of the records disposal provisions of the FRA, on the ground that plaintiffs in this case seek to create, rather than to prevent the destruction of, records. Although appellants concede the inclusion of plaintiffs within the zone of interests of the FRA disposal provisions, they argue that plaintiffs are outside the zone of interests of the records creation provisions of the FRA. We do not find this difference compelling. First, plaintiffs do not seek the creation of any new records, but rather ask only that the records already created be appropriately classified and disposed of pursuant to disposal schedules approved by the Archivist. Additionally, we note that the distinction between records "creation" and records "disposal" in a computer system like PROFS is not as clear as appellants claim. There is little practical difference between an agency official's decision to delete, and thus destroy, a PROFS note because he believes it is not a "record" for purposes of the FRA and his decision to delete a PROFS note that he believes is a "record" without first obtaining the permission of the Archivist. In either case, the note will be lost forever to history. On the basis of the expressed statutory goal of preserving records for historical purposes and our previous decision in *American Friends*, we now hold that because plaintiffs are researchers and historians who make extensive use of government documents, they are within the zone of interests of the records creation and management provisions of the PRA and FRA.[4]

## III. THE PRESIDENTIAL RECORDS ACT

Appellants argue that the APA does not provide a cause of action for judicial review of the President's compliance with the PRA because the President is not an "agency" within the meaning of the APA. Furthermore, even if the APA applies to the President, appellants argue that the PRA precludes judicial review. For the reasons discussed below, we agree with both arguments[5] and reverse the district court's holdings to the contrary.

### A. *The APA Definition of "Agency"*

■ The APA defines an "agency" as: each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—(A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia; ....

5 U.S.C. § 701(b)(1) (definition for judicial review provisions); *see also id.* § 551(1) (definition for subchapter on administrative procedure). Because this definition expressly excludes Congress and the courts but not the President, plaintiffs argue that the plain language should be read as implying that the President is an agency. *See, e.g., De Rieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1322 n. 13 (Temp.Emer.Ct.App.) (suggesting in dicta that the President is an agency under the APA), *cert. denied sub nom., Five Smiths, Inc. v. Hollaway*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *Amalgamated Meat Cutters & Butcher Workmen v. Connally*, 337

---

4. However, plaintiff Gaylord Nelson is not within the zone of interests of the PRA and FRA because he has not established that he is a researcher or historian who uses government documents. This observation does not affect the outcome of the case, however, because the researcher plaintiffs have standing.

5. Appellants argue that plaintiffs may not obtain judicial review under the APA because the PRA precludes judicial review, 5 U.S.C. § 701(a)(1), and additionally the President's recordkeeping decisions are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Because we hold that the PRA precludes judicial review, we need not decide whether the President's recordkeeping decisions are committed to agency discretion by law.

F.Supp. 737, 761 (D.D.C.1971) (three-judge panel) (same). We find, however, that the textual silence, when read against the backdrop of the legislative history of the APA and the canons of construction applicable to statutes that implicate the separation of powers, points in the opposite direction—*i.e.*, that Congress did not intend to subject the President to the APA.

The legislative history of the APA indicates that Congress wanted to avoid a formalistic definition of "agency" that might exclude any authority within the executive branch that should appropriately be subject to the requirements of the APA. For this reason, Congress thought it "necessary to define agency as 'authority' rather than by name or form, because of the present system of including one agency within another or of authorizing internal boards or 'divisions' to have final authority." Senate Judiciary Committee Print, *reprinted in* Legislative History of the Administrative Procedure Act, S.Doc. No. 248, 79th Cong., 2d Sess. 13 (1946) [hereinafter "S.Doc. No. 248"]; *see also* H.Rep. No. 1980, 79th Cong. 2d Sess. (1946), *reprinted in* S.Doc. No. 248 at 253. But we find no expression whatsoever in the legislative history that Congress used the broader term in order to subject the President to the requirements of the APA.

A conclusion that the President is not an "agency" under the APA is also supported by the longstanding practice of the executive branch. Even though the APA rulemaking provisions contain substantially the same "agency" definition as the judicial review provisions, the President has never been thought to have to comply with APA rulemaking procedures when issuing executive orders. Given the lack of any express legislative intent to the contrary, we are reluctant to hold that this longstanding presidential practice is contrary to the APA. *Cf. Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116, 67 S.Ct. 1129, 1132, 91 L.Ed. 1375 (1947) (even though statute does not expressly grant the President the authority to create a new agency, the fact that the President has consistently construed the statute as con-

ferring such authority is entitled to "great weight").

When Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear. The Supreme Court has recognized that "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in decision." *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). Although the "clear statement" rule was originally articulated to guide interpretation of statutes that significantly alter the federal-state balance, there are similar compelling reasons to apply the rule to statutes that significantly alter the balance between Congress and the President.

Legislation regulating presidential action, no less than legislation altering the federal-state balance, raises "serious" practical, political, and constitutional questions that warrant careful congressional and presidential consideration. *See id.* at 350, 92 S.Ct. at 523. The answer to whether the APA should apply to the President depends on an analysis of several factors, including the President's "constitutional powers, the multifarious responsibilities of his office, and his direct political accountability as the only elected official with a national constituency." Bruff, *Judicial Review and the President's Statutory Powers*, 68 Va.L. Rev. 1, 22 (1982). In the absence of any affirmative evidence that these issues were considered in the legislative process and that Congress passed the APA with the understanding that it would regulate presidential as well as other executive branch action, we refuse to hold that the President is an "agency" within the meaning of the APA.

B. *Implied Preclusion of Judicial Review*

█ Appellants also argue that the court cannot review the President's and NSC's compliance with the PRA because the PRA precludes judicial review, 5 U.S.C.

§ 701(a)(1). Because the PRA contains no provision expressly precluding judicial review, the question in this case is whether the statute impliedly precludes judicial review. The presumption favoring judicial review of administrative action is well-established. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). Nevertheless, a congressional intent to overcome the presumption may be found not only in the statute's "express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute*, 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984). We conclude that permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns. We therefore hold that the PRA is one of the rare statutes that does impliedly preclude judicial review.

The statutory scheme and legislative history of the PRA reflect a congressional intent to balance two competing goals. First, Congress sought to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office. H.R. Rep. No. 95–1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5732, 5733. But Congress was also keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations. *See id.* at 6–7, 1978 U.S.CODE CONG. & ADMIN.NEWS at 5737–38. Congress therefore sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office.

Congress balanced these competing goals by requiring the President to maintain records documenting the policies, activities, and decisions of his administration, but leaving the implementation of such a requirement in the President's hands. *See* 44 U.S.C. § 2203(a). For example, although the FRA authorizes the Archivist to promulgate guidelines and regulations to assist the agencies in the development of a records management system, the PRA lacks an analogous provision. The Archivist also lacks the authority under the PRA to inspect the President's records or survey the President's records management practices. Finally, the PRA does not require the Archivist to provide Congress with the annual reports on the President's recordkeeping policies and practices that he must submit for agencies.

Moreover, the PRA accords the President virtually complete control over his records during his term of office. Although the President must notify the Archivist before disposing of records and the Archivist may inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision. *See* H.R.Rep. No. 95–1487 at 13, 1978 U.S.CODE CONG. & ADMIN. NEWS at 5744. Instead, the provision authorizing the Archivist to notify Congress "is solely for notification though the Congress would have its traditional means of voicing objection to particulars in the proposal directly to the President, or ultimately by passing legislation to block the destruction of certain records." *Id.* In light of such cautious authority for the Archivist and Congress to question the President's disposal decisions and the lack of any authority to interfere with his records management practices, it is difficult to conclude that Congress intended to allow courts, at the behest of private citizens, to rule on the adequacy of the President's records management practices *or* overrule his records creation, management, and disposal decisions. *Cf. Banzhaf v. Smith*, 737 F.2d 1167, 1169 (D.C.Cir.1984) (en banc).

In declining to give outsiders the right to interfere with White House recordkeeping practices, Congress presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations.

We will not second-guess that decision or upset the political compromises it entailed. Allowing judicial review of the President's general compliance with the PRA at the behest of private litigants would substantially upset Congress' carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term. We therefore hold that the PRA precludes judicial review of the President's recordkeeping practices and decisions.

### IV. THE FEDERAL RECORDS ACT

Appellants similarly contend that the district court may not consider plaintiffs' claims under the FRA because the FRA precludes judicial review and records creation and management decisions are committed to agency discretion by law. A statute may, of course, provide for judicial review of some agency action but not others, so it is important to distinguish between plaintiffs' separate claims, *i.e.:* (1) the NSC's recordkeeping guidelines and directives are inadequate because they fail to provide NSC staff with sufficient guidance about what material constitutes "records"; and (2) some NSC staff members are destroying records in contravention of the NSC's and Archivist's recordkeeping guidelines and directives.[6] For the reasons discussed below, we find that there is APA review of the NSC's recordkeeping guidelines and instructions, but only limited APA review of claims that records are being destroyed in violation of such guidelines. We therefore affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

### A. *Judicial Review of the Recordkeeping Guidelines*

#### 1. Implied Preclusion of Judicial Review

■ Like the PRA, the FRA contains no express preclusion of judicial review. Ap-

pellants here repeat their argument that the statute impliedly precludes judicial review. They point out that the FRA expressly provides for judicial review only in an action, initiated by the Attorney General at the request of the Archivist or an agency head, to prevent the unlawful removal or destruction of documents. 44 U.S.C. §§ 2905(a), 3106. All other review, they argue, is precluded because Congress chose to ensure compliance with the FRA through administrative enforcement and congressional oversight rather than judicial review. We do not find, however, in the FRA the "clear and convincing evidence" necessary to overcome the presumption in favor of judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). We thus reject appellants' argument for implied preclusion and hold that the district court on remand may entertain plaintiffs' claim that appellants' recordkeeping guidelines and directives to the NSC staff are inadequate because they permit the destruction of "records" that must be preserved under the FRA.

First, the fact the FRA expressly provides for judicial review in an action brought by the Attorney General to prevent the destruction or removal of records does not of itself mean that all other judicial review is precluded. It is well-established law that " '[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.' " *Abbott Laboratories*, 387 U.S. at 141, 87 S.Ct. at 1511 (quoting Jaffe, *Judicial Control of Administrative Action* 357 (1965)).

Similarly, the fact that Congress retains some direct oversight over agencies' com-

---

**6.** Plaintiffs' complaint alleged primarily that appellants are destroying information on the PROFS system in violation of the FRA. As the litigation progressed in the district court, however, the parties focused on two issues: the adequacy of the recordkeeping guidelines, and the extent of agency compliance with them. The district court also considered these two issues separately in ruling on appellants' motion for summary judgment. *See Armstrong,* 721 F.Supp. at 353–54.

pliance with the FRA does not necessarily indicate an intent to preclude judicial review. Indeed, in *American Friends* we rejected this argument as overbroad because it "would create an enormous exception to judicial review: Congress exercises oversight over all agencies, gets reports from many, and is often consulted by the executive branch before specific actions are taken." 720 F.2d at 44. Accordingly, the fact that the Archivist must submit to Congress annual reports evaluating the agencies' records management practices, 44 U.S.C. §§ 2106, 2904(c)(8), and notify Congress of violations of the FRA, *id.* §§ 2115(b), 2905(a), is insufficient evidence to overcome the presumption in favor of judicial review.[7]

█ Appellants additionally argue that Congress, by amending the FRA in 1984 to enhance the enforcement authority and responsibilities of the Archivist, reinforced its intent to supplant all judicial review. We view the 1984 amendments, however, as not intended to bar judicial review, but instead as a direct response to the Supreme Court's decision in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). In *Kissinger*, the Supreme Court held that the FRA does not contain an implied cause of action allowing private parties to bring suit to recover records that have been unlawfully removed from an agency. Recognizing that this created "the anomalous situation ... whereby an agency head has a duty to initiate action to recover records which he himself has removed," Congress amended the FRA to require the Archivist to ask the Attorney General to sue and to notify Congress if the agency head failed to make a similar request of the Attorney General. H.R. Conf. Rep. No. 98–1124, 98th Cong. 2d Sess. 28 (1984), *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 3865, 3894, 3903; *see*

*also* 44 U.S.C. § 2905(a) (Archivist's enforcement authority), § 3106 (agency head's enforcement authority). Nothing in the Conference Report or the 1984 amendments indicates a congressional intent to preclude ordinary judicial review of the adequacy of an agency's recordkeeping guidelines and directives. The more natural reading is that Congress intended only to eliminate the *Kissinger* loophole and establish a more effective administrative enforcement process to prevent the unlawful destruction or removal of records by agency officials.

In sum, neither the statutory scheme nor the legislative history evinces a congressional intent to preclude judicial review of the adequacy of the NSC's recordkeeping guidelines and directives. In this respect, we note that the legislative history and statutory scheme of the FRA differ significantly from the PRA. In drafting the FRA, Congress did not have to worry about the stark separation of powers questions implicated by legislation regulating the conduct of the President's daily operations. The congressional intent, evident in the PRA, to minimize outside interference with the President's recordkeeping practices is lacking in the FRA, with its more detailed and comprehensive agency recordkeeping provisions. Instead, the FRA reflects a congressional intent to ensure that agencies adequately document their policies and decisions, S.Rep. No. 2140, 81st Cong., 2d Sess. 2 (1950), and that their records management programs strike a balance "between developing efficient and effective records management, and the substantive need for Federal records." S.Rep. No. 94–1326, 94th Cong., 2d Sess. 2 (1976), *reprinted in* 1976 U.S.CODE CONG. & ADMIN. NEWS 6150, 6150–51; *see also* 44 U.S.C. § 2902. Allowing judicial review of the adequacy of an agency's recordkeeping

---

7. *Banzhaf v. Smith*, 737 F.2d 1167 (D.C.Cir. 1984) (en banc), on which appellants primarily rely, is not contrary to this conclusion. In *Banzhaf*, we held that the Ethics in Government Act, 28 U.S.C. § 591 *et seq.*, precluded private actions. Under the Ethics in Government Act, Congress' role was specifically prescribed: Congress was empowered to seek the appointment of independent counsel when the Attorney General refused to do so. In contrast, the FRA merely requires the Archivist to report violations of the Act to Congress. What Congress will then do is not specified. The FRA's reporting requirement is not the sort of "explicit provision of congressional oversight" we found controlling in *Banzhaf*, 737 F.2d at 1169.

guidelines will frustrate neither the intent of Congress nor the FRA statutory scheme designed to implement that intent. Accordingly, we hold that the district court was authorized to hear plaintiffs' APA claim that the NSC's recordkeeping guidelines and directives do not adequately describe the material that must be retained as "records" under the FRA.

### 2. Committed to Agency Discretion by Law

■ Appellants claim that even if the FRA does not preclude judicial review, the establishment of guidelines and directives defining "records" under the FRA is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Because we find that there is "law to apply" and the factors that courts point to as weighing against judicial review are not present in this instance, we reject appellants' argument.

Under the classic formulation, agency action is committed to agency discretion by law if the statute authorizing the agency action is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (internal quotations omitted). The FRA clearly provides sufficiently detailed standards regarding what material the agencies must retain. For example, the FRA contains a detailed definition of the "records" that agencies must preserve. 44 U.S.C. §§ 2901(1), 3301. It also mandates that the head of each agency "shall establish and maintain" a records management program, 44 U.S.C. § 3102, and "shall establish safeguards against the removal or loss of records," 44 U.S.C. § 3105. Although the FRA understandably leaves the details of records management to the discretion of individual agency heads, it does contain several specific requirements, including the requirement that each agency head shall cooperate with the Archivist and develop a program that is consistent with the Archivist's regulations.[8] *See* 44 U.S.C. § 3102. We thus have no difficulty in concluding that the FRA provides sufficient law to apply in evaluating the adequacy of appellants' guidelines and directives.

In determining whether agency decisions are committed to agency discretion by law, courts have also considered several pragmatic considerations that may militate for or against judicial review of appellants' guidelines and directives. These factors include: "(1) the need for judicial supervision to safeguard the interests of the plaintiffs; (2) the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and (3) the appropriateness of the issues raised for judicial review." *American Friends,* 720 F.2d at 41 (internal quotations omitted).

In this case, none of these considerations suggests that preclusion of review is appropriate. First, judicial review of the appellants' recordkeeping guidelines and directives is necessary to protect plaintiffs' interests because, if the guidelines are both inadequate and unreviewed, documents that plaintiffs would otherwise be able to study will be destroyed. Second, judicial review of the guidelines and directives will not impede the "effectiveness of the agency in carrying out its congressionally assigned role." *See id.* at 44. Appellants' concerns that allowing judicial review of their guidelines will "unduly interfere with agency functioning" by requiring agency staff to save "every scrap of paper" pending a judicial determination of whether it is a record are unfounded. As we recognized in *American Friends,* even if a court may review the adequacy of an agency's guidelines, agency personnel will implement the guidelines on a daily basis. 720 F.2d at 41. Thus agency personnel, not the court, will actually decide whether specific documents—whether they be scraps of paper or PROFS notes—constitute "records" un-

---

**8.** We note, moreover, that the Archivist has recently promulgated new regulations defining federal records, 36 C.F.R. § 1222.12, detailing the agencies' responsibilities in developing records management programs, *id.* §§ 1222.20, 1222.32, and identifying distinguishing characteristics of federal records, *id.* § 1222.34, and personal papers, *id.* § 1222.36. *See* 55 Fed.Reg. at 27,422–25 (1990).

der the guidelines. Third, and most importantly, the only issue a court would be asked to consider, *i.e.,* the adequacy of appellants' recordkeeping guidelines and directives, is clearly appropriate for judicial review. Courts review the adequacy and conformity of agency regulations and guidelines with statutory directives every day.

In sum, none of the practical factors prompting against review applies in this case. The FRA provides sufficient law to apply, and we find no reason to conclude that Congress intended to commit the development of recordkeeping guidelines and directives to the agencies' complete discretion.

## B. *Judicial Review of Compliance with the Guidelines*

### 1. Preclusion of Judicial Review

■ Plaintiffs also allege that even if the NSC's guidelines are found to be reasonable, some NSC officials and staff are not complying with the guidelines and the APA authorizes the district court to entertain their challenges and grant relief. Here we part company with the plaintiffs and the district court. We believe that the FRA contains a prescribed method of action in such cases: it requires the agency head, in the first instance, and then the Archivist to request that the Attorney General initiate an action to prevent the destruction of documents, thereby precluding private litigants from suing directly to enjoin agency actions in contravention of agency guidelines.

In reaching this result, we rely on the rationale of the Supreme Court in *Kissinger.* In rejecting the claim that the FRA contained an implied right of action for private litigants to prevent the removal of records, the Court stated that "the Federal Records Act establishes only one remedy for the improper removal of a 'record' from the agency": the agency head, in conjunction with the Archivist, is required to request the Attorney General to initiate an action to recover records unlawfully removed from the agency. *Kissinger,* 445 U.S. at 148, 100 S.Ct. at 967; *see also* 44

U.S.C. § 3106. After briefly analyzing the legislative history of the FRA, the Court concluded that "Congress expressly recognized the need for devising adequate statutory safeguards against the unauthorized removal of agency records, and opted in favor of a system of administrative standards and enforcement." *Id.* at 149, 100 S.Ct. at 968.

The 1984 amendments to the FRA support the reasoning of *Kissinger* and indicate that Congress again decided to rely on administrative enforcement, rather than judicial review at the behest of private litigants, to prevent the destruction or removal of records. After the *Kissinger* case, Congress recognized that the FRA administrative enforcement mechanism needed to be strengthened "[b]ecause of the frequency of incidents of removal or destruction of records in recent years." H.R. Conf. Rep. No. 98–1124 at 28, 1984 U.S.CODE CONG. & ADMIN.NEWS at 3903. Therefore, Congress enhanced the Archivist's authority to prevent the unlawful removal or destruction of records by requiring the Archivist to notify Congress and independently request that the Attorney General initiate an action if the agency head refused to do so. *See id.* at 27, 1984 U.S.CODE CONG. & ADMIN. NEWS at 3902; 44 U.S.C. § 2905(a).

Thus the conferees, "mindful of the protracted private litigation" involved in the *Kissinger* case, chose to strengthen the administrative enforcement mechanism rather than explicitly sanctioning litigation at the behest of private citizens. *See* H.R. Conf.Rep. No. 98–1124 at 28, 1984 U.S. CODE CONG. & ADMIN.NEWS at 3903. We will not second-guess that decision. Because it would clearly contravene this system of administrative enforcement to authorize private litigants to invoke federal courts to prevent an agency official from improperly destroying or removing records, we hold that the FRA precludes judicial review of such actions. *Cf. Block v. Community Nutrition Institute,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984) ("When a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular

persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").[9]

We do conclude, however, that it would not be inconsistent with *Kissinger* or the FRA to permit judicial review of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General.[10] Nothing in the legislative history suggests that Congress intended to preclude judicial review of either the agency head's or the Archivist's failure to take enforcement action. Indeed, judicial review of the agency head's and Archivist's failure to take enforcement action reinforces the FRA scheme by ensuring that the administrative enforcement and congressional oversight provisions will operate as Congress intended. Unless the Archivist notifies the agency head (and, if necessary, Congress) and requests the Attorney General to initiate legal action, the administrative enforcement and congressional oversight provisions will not be triggered, and there will be no effective way to prevent the destruction or removal of records. Thus, if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action.

### 2. Committed to Agency Discretion by Law

Finally, we hold that the decision to seek the initiation of an enforcement action to prevent the destruction or removal of records is not committed by law to the agency head's or Archivist's discretion.[11] Although there is a presumption that an agency's decision not to take enforcement action is immune from judicial review under 5 U.S.C. § 701(a)(2), "Congress may limit an agency's exercise of enforcement power ... [and overcome the presumption] by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). Because the FRA enforcement provisions leave *no* discretion to determine which cases to pursue, the agency head's and Archivist's enforcement decisions are not committed to agency discretion by law.

In contrast to a statute that merely *authorizes* an agency to take enforcement action as it deems necessary, the FRA *requires* the agency head and Archivist to take enforcement action. *Cf. Heckler*, 470 U.S. at 835, 105 S.Ct. at 1657

---

9. *American Friends* is not contrary to this holding. In that case, we held that the APA authorized judicial review of the adequacy of the FBI's record disposal schedules, which had been approved by the National Archives and Records Service. We went on to hold that two of the disposal schedules were "arbitrary and capricious" because they failed to provide a "reasoned justification explaining why certain types or categories of investigative data should be destroyed" and because the disposal instructions they contained were "broad enough to justify wholesale destruction or selective, standardless retention [of records] on the basis of 'administrative needs.'" 720 F.2d at 65–66. Thus *American Friends* decided only that the APA authorized judicial review of the adequacy of an agency's records disposal schedules and system; it did not decide whether the APA authorized a court, at the behest of private litigants, to enjoin individual agency officials from destroying records in contravention of the agency's and Archivist's established recordkeeping guidelines and disposal schedules.

10. Plaintiffs' complaint did not specifically allege that the Archivist violated the FRA by failing to request that the Attorney General initiate an action to prevent the NSC staff from destroying records in contravention of the NSC's guidelines. Plaintiffs did allege, however, that the Archivist "has acquiesced in the other defendants' intention to destroy the bulk of information generated by the PROFS system in the normal course of business, in violation of his responsibilities" under the FRA. Amended Complaint for Declaratory and Injunctive Relief ¶ 32. We therefore believe that the plaintiffs have preserved the issue, and the district court on remand may allow plaintiffs to amend their complaint accordingly.

11. Because the Attorney General is not a defendant in this case, we do not decide whether the Attorney General's decision not to initiate an enforcement action at the request of the Archivist or an agency head is immune from judicial review under 5 U.S.C. § 701(a)(2).

(FDA's decision not to take enforcement action is unreviewable under 5 U.S.C. § 701(a)(2) because the Federal Food, Drug, and Cosmetic Act's enforcement provision "provides only that '[t]he Secretary is *authorized* to conduct examinations and investigations ... ' ") (emphasis in original). Once the Archivist becomes aware of *"any* actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records," the Archivist *"shall* notify the head of [the] Federal agency" involved and "assist the head of the agency in initiating action through the Attorney General for the recovery of records unlawfully removed and for other redress provided by law." 44 U.S.C. § 2905(a) (emphasis added). Similarly, once the agency head becomes aware of *"any* actual, impending, or threatened unlawful, removal, defacing, alteration, or destruction of records," the agency head *"shall* notify the Archivist" and "with the assistance of the Archivist *shall* initiate action through the Attorney General." *Id.* § 3106 (emphasis added).[12] If, however, the agency head does not initiate an enforcement action "within a reasonable period of time," the Archivist *"shall* request the Attorney General to initiate such an action, and *shall* notify the Congress when such a request has been made." *Id.* (emphasis added). On the basis of such clear statutory language man-

dating that the agency head and Archivist seek redress for the unlawful removal or destruction of records, we hold that the agency head's and Archivist's enforcement actions are subject to judicial review.

### V. STANDARD OF REVIEW AND PROCEEDINGS ON REMAND

 Although the district court correctly held that the APA authorized judicial review of appellants' recordkeeping guidelines and directives, it denied appellants' motion for summary judgment, pending further development of the record, on the grounds that "a reasonable factfinder, surveying the record in the light most favorable to the plaintiffs, would [not] necessarily conclude that the guidelines are adequate." *Armstrong,* 721 F.Supp. at 354. Appellants challenge this denial of summary judgment. Because we agree that the present record is inadequate to determine the reasonableness of the guidelines, we remand for further proceedings on the merits of the adequacy of the guidelines.[13]

At the time summary judgment was denied, the record contained copies of several documents informing the NSC staff of their obligation to create and maintain hard copy "records" before erasing the PROFS tapes—*e.g.,* the White House Office Staff Manual, the EOP Records Management

---

**12.** We emphasize the mandatory statutory language because it indicates that the agency head and Archivist are required to take action to prevent the unlawful destruction or removal of records and, if they do not, private litigants may sue under the APA to require them to do so. We do not mean to imply, however, that the Archivist and agency head must initially attempt to prevent the unlawful action by seeking the initiation of legal action. Instead, the FRA contemplates that the agency head and Archivist may proceed first by invoking the agency's "safeguards against the removal or loss of records," 44 U.S.C. § 3105, and taking such intra-agency actions as disciplining the staff involved in the unlawful action, increasing oversight by higher agency officials, or threatening legal action.

**13.** In affirming the district court's decision not to grant summary judgment, we obviously hold that the issue is properly before this court. Plaintiffs argued that appellants failed to raise the issue because their petition for permission to take an interlocutory appeal presented only the question whether the "arbitrary and capri-

cious" test was the proper scope of judicial review of the NSC and EOP guidelines. We reject this argument because appellants presented the same arguments in their petition for permission to take an interlocutory appeal as in their opening brief in this court, *i.e.,* that, if available, APA review must be limited to a determination of whether the guidelines are arbitrary and capricious or otherwise not in accordance with law and that the district court erred by misreading the guidelines and finding a disputed issue of material fact that warranted further discovery. In addition, under 28 U.S.C. § 1292(b), "the appeal is from an *order* of the district court, not from the particular question that the district court found controlling." *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1002 n. 2 (D.C.Cir.1986) (emphasis in original), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987). We therefore have jurisdiction to review the entire order, not just the questions certified as controlling. *See* Wright, Miller & Cooper, 16 FEDERAL PRACTICE AND PROCEDURE § 3929 at 144.

Program manual, and other memoranda concerning records management. It is not clear from the record, however, whether these documents comprise the total "guidance" given to NSC staff regarding their recordkeeping responsibilities or whether, as plaintiffs asked in interrogatories, there are other informal, supplementary guidance. For example, how did appellants respond to questions about whether particular documents or types of documents constitute records that must be maintained? Was any additional guidance provided in staff meetings in which recordkeeping responsibilities were discussed? Did appellants consistently advise their staff that particular types of documents—such as PROFS notes or calendars—are or are not records?

■ With answers to such questions, which can be obtained "either through affidavits or testimony," the record should contain sufficient information for the district court to determine whether the NSC recordkeeping guidelines and directives satisfy the NSC's statutory obligations to "make and preserve records" documenting the "functions, policies, decisions, procedures, and essential transactions" of the NSC, 44 U.S.C. § 3101, and to ensure that these records are destroyed only pursuant to disposal schedules approved by the Archivist, *id.* §§ 3105(a), 3303a. *Cf. Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). On remand, therefore, the district court should determine whether the NSC's guidelines and directives are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because they permit the destruction of record material that should be maintained.[14]

## VI. Conclusion

We hold first that plaintiffs are within the zone of interests of the PRA and FRA

and, therefore, have standing to bring this action. Second, we reverse the district court's decision that the APA authorizes judicial review of the President's compliance with the PRA. The APA does not authorize judicial review of the President's compliance with the PRA because the President is not an "agency" within the meaning of the APA and because the PRA precludes judicial review of the President's record creation and management decisions.

Third, we affirm the district court's decision that the APA authorizes judicial review of plaintiffs' claim that the NSC's recordkeeping guidelines and directives are arbitrary and capricious. Fourth, we hold that the FRA precludes direct private actions to require that agency staff comply with the agency's recordkeeping guidelines. Instead, the APA authorizes the district court to entertain a properly pleaded claim that the Archivist or an agency head has breached the statutory duty to take enforcement action to prevent an agency official from destroying records in contravention of the agency's recordkeeping guidelines or to recover records unlawfully removed from an agency.

Finally, we affirm the district court's decision to deny appellants' motion for summary judgment because the record is not yet adequate to determine whether the NSC's guidelines are arbitrary or capricious.

*It is so ordered.*

---

**14.** We recognize, of course, that the determination of whether a variety of particular documents or computer entries are, in fact, records must be made by agency staff on a daily basis, and some innocent mistakes are bound to occur. Consequently, the fact that some record material may have been destroyed does not

compel a finding that the guidelines are arbitrary and capricious. Instead, the guidelines should be evaluated on the basis of whether they adequately explain the factors that agency staff should consider in deciding whether specific documents or computer entries are records.