Scott ARMSTRONG, et al.,
Appellees/Cross-
Appellants

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, et al., Appellants/Cross–Appellees.

Nos. 95–5057, 95–5061.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1995.

Decided Aug. 2, 1996.

---

Freddi Lipstein, Senior Counsel, Washington, DC, United States Department of Justice, argued the cause, for appellants, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Leonard Schaitman, Attorney, United States Department of Justice, were on the briefs. Michael J. Singer, Assistant Director, and Matthew M. Collette, Attorney, United States Department of Justice, entered appearances.

Michael E. Tankersley, Washington, DC, argued the cause, for appellees, with whom David C. Vladeck and Alan B. Morrison, were on the briefs.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting Opinion filed by Circuit Judge TATEL.

GINSBURG, Circuit Judge:

This case presents the question whether the National Security Council is an "agency" subject to the Freedom of Information Act, 5 U.S.C. § 552(f), that is, whether the NSC is an "executive department ... or other establishment in the executive branch." If so, then the NSC is both subject to the disclosure requirements of the FOIA and obligated to preserve its records in accordance with the Federal Records Act, 44 U.S.C. §§ 3101–07, 3301–14.

The plaintiff-appellees are the National Security Archive, a research institute and library; Scott Armstrong, a journalist affiliated with the Archive; and several associations, including the National Library Association and the National Historical Association (hereinafter referred to collectively as Armstrong). The defendant-appellants are the Executive Office of the President; the Office of Administration and the NSC, which are components of the EOP; the White House Communications Agency, an element of the Department of Defense; and Trudy Peterson, the Acting Archivist of the United States.

The district court granted Armstrong's motion for summary judgment, declared that the NSC is an agency subject to the FOIA, and directed it to comply with both the FOIA and the FRA. The court carved out an exception, however, for the records of high-level officials of the NSC who serve solely to advise and assist the President. *Armstrong v. Executive Office of the President,* 877 F.Supp. 690, 705–06 (D.D.C.1995).

The Government appeals, arguing that because the NSC does not exercise substantial authority, independent of the President, it is not an agency within the meaning of the FOIA and that its treatment as such would so intrude upon the core functions of the President as to "raise a significant constitutional concern" about the separation of powers. Armstrong cross-appeals, challenging the exception for high-level officials who act solely as advisers to the President.

Because the NSC operates in close proximity to the President, who chairs it, and because the NSC does not exercise substantial

independent authority, we conclude that the NSC is not an agency within the meaning of the FOIA. Accordingly, we reverse the judgment of the district court without reaching the question raised by the plaintiffs' cross-appeal.

## I. Background

The statutory mandate of the NSC is generally "to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security" and to perform "such other functions as the President may direct." National Security Act of 1947, 50 U.S.C. §§ 402(a)-(b). The Council members are the President and certain cabinet-level officials, including the National Security Adviser (NSA)—formally, the Assistant to the President for National Security Affairs. The NSC staff, which numbers about 150 persons, is headed by an Executive Secretary, who reports to the NSA, and whom the President appoints without need of Senate confirmation. *Id.* § 402(c).*

■ The Presidential Records Act, 44 U.S.C. § 2201 *et seq.*, which applies to most NSC documents, provides in part that a president's records are to be made publicly available five years after he leaves office, except that national defense and certain other information is to be made available no later than 12 years after the end of a president's term. § 2204. For purposes of the PRA, presidential records do not include "any documentary materials that are . . . official records of an agency," as the term "agency" is defined in the FOIA, 5 U.S.C. § 552(f). 44 U.S.C. § 2201(2)(B)(I). At the same time, the coverage of the FRA is coextensive with the definition of "agency" in the FOIA, *see Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1293 (D.C.Cir.1993). As a result, no record is subject to both the FRA and the PRA: "The FRA describes a class of materials that are federal records subject to its provisions, and the PRA describes another, mutually exclusive set of materials that are

subject to a different and less rigorous regime." *Id.*

■ The PRA and the FRA differ in several respects that are of concern to the parties to this case. First, while both laws require the preservation of records, the procedures to prevent improper destruction of documents covered by the FRA are significantly more demanding; hence, the district court ordered the NSC to adopt new guidelines in order "to ensure that non-Presidential records are preserved under the Federal Records Act and not destroyed under the guise of the Presidential Records Act." 877 F.Supp. at 707. Second, record-keeping requirements of the FRA are subject to judicial review and enforcement; those of the PRA are not. *Armstrong v. Bush*, 924 F.2d 282, 295 (D.C.Cir.1991). Third, the joint regime of the FRA and the FOIA can affect a president's daily operations during his term of office, while the PRA is applicable to a president's papers only after he has left office. Fourth, insofar as NSC records are subject to the FRA, a president may not take such documents with him upon leaving office (as past presidents have generally done) without the approval of the Archivist. 44 U.S.C. §§ 3303, 3303a; *see also* 44 U.S.C. § 3106 (Attorney General may initiate legal action to retrieve records unlawfully removed).

The legal controversy over procedures for the preservation of NSC records has a lengthy and complex history, which is fully recounted in *Armstrong*, 1 F.3d at 1280–82. In January 1989 Armstrong made a request under the FOIA for all documents stored in the EOP and the NSC electronic communications systems since their installation in the mid–1980's. At the same time Armstrong sought a declaration in district court that those electronic documents and associated backup tapes are federal or presidential records, and an injunction prohibiting their destruction. For our present purpose it is sufficient to recall that the district court concluded that certain items stored in the NSC's computer system are records subject

---

* For clarity of exposition, we refer to the President and the cabinet-level officials who constitute the senior decision-making body of the NSC as the "Council" or "statutory Council." We use "the NSC" to mean, depending upon the context, either the staff that supports the statutory Council or the entire organization, including both the Council and the staff.

to the FRA, and that the NSC's guidelines relating to the preservation of those records were arbitrary and capricious. *Armstrong v. Executive Office of the President,* 810 F.Supp. 335 (D.D.C.1993). When, four months thereafter, the Government still had not promulgated new guidelines for the management of those electronic records, the district court entered an order of contempt. 821 F.Supp. 761 (D.D.C.1993). On appeal we agreed that the NSC's guidelines were inadequate, but we reversed the contempt citation, which was premised upon the Government's failure to act by a date certain. 1 F.3d at 1274. At the same time, upon Armstrong's cross-appeal challenging the NSC's procedures for classifying records, we remanded the matter for the district court to determine whether the NSC properly distinguishes between presidential and federal records. *Id.*

The Office of Legal Counsel then rendered an opinion reversing the position it had taken in 1978 and declaring that the NSC is not an agency subject to the FOIA and therefore does not have to comply with the FRA. Memorandum of Walter Dellinger, Acting Assistant Attorney General, Office of Legal Counsel to Alan J. Kreczko, Special Assistant to the President, Sept. 20, 1993. President Clinton adopted the OLC's new position but instructed his NSA, Anthony Lake, that the NSC should voluntarily disclose "appropriate" records, including those that had been "transferred by one Administration to another for transition and continuity purposes." Memorandum from the President, Mar. 2, 1994. The Executive Secretary thereupon revoked the NSC's FOIA guidelines and asserted that all NSC documents are presidential records, exempt from both the FOIA and the FRA. Memorandum of William H. Itoh to William H. Leary, Mar. 25, 1994.

The district court then issued the decision that we now review. The court rejected the OLC's analysis and held that the NSC is an agency subject to the FRA and must maintain and preserve its records in accordance with that statute. 877 F.Supp. at 695. According to the district judge, the NSC does not solely advise and assist the President. *Id.* at 700. Rather, the NSC exercises authority independent of the President in several areas, including: overseeing the CIA, providing guidance and direction to the intelligence community, and protecting classified information. *Id.* at 702–03. Nonetheless, the court held that in "limited circumstances" when "high level officials of the NSC ... act not as members of an agency but, solely as advisors to the President," the resulting records are governed by the PRA, not by the FRA. *Id.* at 705. In the alternative, the district court held that the NSC should be treated as an agency because the NSC had itself previously determined that it was an agency and operated accordingly but had not offered a reasoned explanation for its later change of position. *Id.* at 706.

On this appeal the Government contends, *inter alia,* that the interaction between the President and the NSC requires privacy and confidentiality. Notwithstanding that national security information and deliberative documents are exempt from disclosure under the FOIA, 5 U.S.C. § 552(b)(1) and (5), the Government contends that the possibility of premature disclosure pursuant to the FOIA would make the President's conduct of national security policy excessively circumspect and would chill the communication necessary for effective and efficient decision-making. We need not wade into such deep waters, however, in order to resolve the present controversy.

## II. Analysis

"Records" are defined by the FRA as documentary materials "made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business." 44 U.S.C. § 3301. For purposes of the FOIA, the Congress originally defined an agency as "each authority of the Government of the United States," subject to certain enumerated exceptions not relevant here. Administrative Procedure Act, 5 U.S.C. § 551(1). In *Soucie v. David,* 448 F.2d 1067, 1073 (D.C.Cir.1971), which concerned coverage under the FOIA of the Office of Science and Technology, another unit in the Executive Office of the President, we interpreted this definition to encompass "any administrative unit with substantial independent authority in the exercise

of specific functions." In 1974 the Congress amended the FOIA definition to cover any "establishment in the executive branch of the Government (including the Executive Office of the President)." 5 U.S.C. § 552(f). This expanded definition was not, however, meant to cover "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." H.R. CONF. REP. No. 1380, 93d Cong., 2d Sess. 14 (1974).

That the Congress intended to codify *Soucie* is clear enough. *See Meyer v. Bush,* 981 F.2d 1288, 1291 (D.C.Cir.1993). Less clear is the test of an entity's status as an "agency" subject to the FOIA. Is it (a) whether the entity exercises "substantial independent authority," as we put the matter in *Soucie;* or (b) whether, in the terms of the Conference Report, the entity's "sole function is to advise and assist the President"? As applied to an official or a group of officials who serve in dual roles, the two tests may yield different results. On the difficulty presented by the so-called dual-hat problem, *see Ryan v. Department of Justice,* 617 F.2d 781, 789 (D.C.Cir.1980) (unit or official that is part of agency and has non-advisory functions cannot be "non-agency in selected contexts on a case-by-case basis"), and *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980) (notes made by National Security Adviser "in his capacity as Presidential adviser, only" not agency records despite NSA's dual role as official of NSC).

Because we conclude below that neither the statutory Council nor the NSC staff performs significant non-advisory functions, we need not address the dual-hat controversy. Nor need we address the implications of that controversy for the exception created by the district court for high-level officials.

## A. The Three–Factor Test of Meyer

█ In *Meyer* the court managed to harmonize the "sole function" and the "substantial independent authority" criteria by using a three-factor test to determine the status under FOIA of a unit in the Executive Office of the President. There we held that a group of senior advisers to the President, working within the EOP as the Task Force on Regulatory Relief, did not constitute an agency under the FOIA even though the group "evaluated agency regulatory efforts and had authority to provide some direction over agency rulemaking." 981 F.2d at 1292. Reading the Conference Report against the background of *Soucie,* we inferred that the Congress intended the phrase "solely to advise and assist the president" to refer to "entities whose characteristics and functions were similar to those of the president's immediate personal staff." *Id.* at 1293. Therefore we identified "three interrelated factors" relevant to determining whether those who both advise the President and supervise others in the Executive Branch exercise "substantial independent authority" and hence should be deemed an agency subject to the FOIA. These factors are: (1) "how close operationally the group is to the President," (2) "whether it has a self-contained structure," and (3) "the nature of its delegat[ed]" authority. *Id.* These three factors are not necessarily to be weighed equally; rather, each factor warrants consideration insofar as it is illuminating in the particular case.

The closer an entity is to the President, the more it is like the White House staff, which solely advises and assists the President, and the less it is like an agency to which substantial independent authority has been delegated. And while a definite structure may be a prerequisite to qualify as an "establishment within the executive branch," *see id.* ("The President does not create an 'establishment' ... every time he convenes a group of senior staff or departmental heads to work on a problem"), not every establishment is an agency under the FOIA. Although structure and function may be related for purpose of defining an agency—clear lines of authority facilitate the implementation of policy—they are not the same consideration.

The three-part test of *Meyer* is designed succinctly to capture the court's prior learning on the subject whether a unit within the Executive Office of the President is an agency covered by the FOIA. As reflected in those cases, the specific evidence bearing upon that question varies with the entity in

question. In *Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259, 1262–63 (D.C.Cir.1980), we held that the Council on Environmental Quality is an agency because of its independent authority to "issue guidelines to federal agencies," "coordinate federal programs," and oversee certain activities of other federal agencies. The Office of Science and Technology is within the ambit of the FOIA, notwithstanding its proximity to the President, because it has independent authority to evaluate federal scientific programs, initiate and support research, and award scholarships. *Soucie*, 448 F.2d at 1075. The Office of Management and Budget is a FOIA agency, in part because it has a statutory duty to provide budget information to the Congress. *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C.Cir. 1978).

 On the other hand, although the Council of Economic Advisers is fairly characterized as an "establishment"—it has a staff, a budget, and a defined structure—it has no regulatory power or other functions, under either its organic statute or any Executive Order, that would suggest that it exercises independent authority; therefore, it is not a FOIA agency. *Rushforth v. CEA*, 762 F.2d 1038, 1043 (D.C.Cir.1985). Nor do the staff of the Executive Residence come under the FOIA; their duty is to manage the President's home subject to his direction and approval, which they do without the delegation of substantial independent authority. *Sweetland v. Walters*, 60 F.3d 852, 854–55 (D.C.Cir.1995).

 In this case, if the operating relationship between the NSC and the President is as close as the Government maintains, then a hierarchical structure, large staff, and separate budget will not by themselves subject the NSC to the FOIA; Armstrong will have to show that the NSC exercises significant independent authority in order to qualify it as an agency. It is not the number of functions delegated to the NSC, but the degree of the NSC's independence in discharging them, that matters. *See Meyer*, 981 F.2d at 1293. If Armstrong shows that the NSC does exercise substantial independent authority, then the NSC cannot be said solely to advise and assist the President; that is the consequence of the "sole function" test set forth in the Conference Report and fleshed out in *Meyer*.

Whether an entity without a self-contained structure could ever qualify as an agency that exercises substantial independent authority seems very doubtful. For this reason, we take up first the question whether the NSC has a self-contained or determinate structure. If the organizational lines of authority and responsibility within the NSC are undefined, or the NSC cannot readily be distinguished from other elements of the Executive Office of the President that solely advise and assist the President, then we do not need to go any further down the *Meyer* road in order to conclude that the NSC is not a distinct agency. Because we conclude that the NSC's structure is self-contained, however, we do go on to examine the other *Meyer* factors; only then are we led to the conclusion that the NSC is not an agency subject to the FOIA.

### 1. The Structure of the NSC

We said in *Meyer* that a "characteristic of the President's immediate staff is its lack of a firm structure." 981 F.2d at 1296. Here the district court correctly characterized the NSC as having a "firm structure," a staff, and a separate budget, 877 F.Supp. at 700–01, making it less like (to quote the Conference Report again) "the President's immediate personal staff or [a] unit[ ] in the Executive Office [of the President] whose sole function is to advise and assist the President." For its part, however, the Government contends that the NSC staff overlaps that of the President's immediate personal staff and that the structure of the NSC merely reflects and confirms its role as the personal instrument of the President; the organization and functions of the NSC staff are molded by each President, acting through his National Security Adviser, to reflect the priorities of that President.

President Clinton's National Security Adviser, Anthony Lake, implies, in a declaration submitted to the district court, that the NSC is not the self-contained structure it might seem from a glance at its organization chart.

The NSC staff, he reports, "operates within the White House as the President's foreign policy and national security staff"; indeed, he points out, several individuals occupy positions on the organizational charts of both the White House and the NSC.

Armstrong responds by emphasizing the hierarchical NSC organization chart, which, he argues, reveals an elaborate, self-contained structure and bureaucracy of the sort indicative of an agency under the analysis in *Meyer.* We agree. The NSC staff is not an amorphous assembly from which ad hoc task groups are convened periodically by the President. On the contrary, it is a professional corps of more than 150 employees, organized into a complex system of committees and working groups reporting ultimately to the Executive Secretary. There are separate offices, each responsible for a particular geographic region or functional area, with clearly established lines of authority both among and within the offices. The several points of tangency between the White House and the NSC staff noted by Mr. Lake do not intertwine the NSC with "the President's immediate personal staff" in any way that obscures the line of perforation between the NSC and other units in the EOP; in fact, all of the individuals holding titles on both the NSC and White House staffs are in a non-substantive area, public affairs.

We conclude that the NSC has a structure sufficiently self-contained that the entity could exercise substantial independent authority. The remaining question is whether the NSC does in fact exercise such authority. We approach that question, as we did in *Meyer,* by considering how close the operation of the NSC is to that of the presidency, and by examining the nature of such authority as has been delegated to the NSC.

### 2. The Proximity of the NSC to the President

Armstrong concedes that the NSC is "proximate" to the President, but he could hardly do otherwise: The President chairs the statutory Council, and his National Security Adviser, working in close contact with and under the direct supervision of the President, controls the NSC staff. The intimate organizational and operating relationship between the President and the NSC is, in our view, entitled to significantly greater weight in evaluating the NSC's arguable status as an agency than is the self-contained structure of the entity. Accordingly, Armstrong must make a strong showing indeed regarding the remaining factor under *Meyer* before we can conclude that the NSC exercises substantial authority, independent of the President.

### 3. The Nature of the Authority Delegated to the NSC

The Government's position is, as it must be, that neither the Congress nor the President has delegated any function to the NSC other than that of advising and assisting the President. We consider first the question of congressional delegation.

Under the National Security Act, the NSC is authorized to: (a) advise the President upon national security matters; (b) coordinate the policies and functions of other departments and agencies regarding national security matters; (c) assess and appraise the objectives and commitments of, and the risks facing, the United States; (d) consider policies on national security matters; and (e) make recommendations to the President. 50 U.S.C. §§ 402(a)-(b). The Government deems it self-evident that these statutory provisions do not by themselves authorize the NSC to perform any non-advisory function.

Armstrong's only argument to the contrary is based upon a section of the Act providing that the Director of Central Intelligence acts "[u]nder the direction of the National Security Council" and "as the President or the National Security Council may direct." 50 U.S.C. §§ 403–3(a)(1), 403–3(c)(6). Armstrong maintains that this provision (as "reinforced" by Executive Order 12,-333) delegates independent authority to the NSC. As we understand it, however, the statute delegates authority not to the institutional NSC but to the President and the statutory Council headed by the President. A member of the Council acts not as the head of his or her department but as an adviser or assistant to the President. Our

observations in *Meyer* regarding the Task Force on Regulatory Relief, of which the President was not himself a member, are even more clearly applicable to the statutory Council, which the President chairs:

> [I]t is rather hard to imagine that ... any ... head of a department or agency who *reports directly* to the President, would acquiesce in a [Council] decision that was thought not to represent directly and precisely the President's opinion. It seems implicit that ... members of the [Council] were not expected to resolve disputes themselves, *without presenting those disputes to the President,* unless they already knew the President's views on the exact issue. This, of course, means the [Council] was not expected to act with significant independence.

981 F.2d at 1295 (emphasis in original).

Nor does anything in the record suggest that the President has empowered the NSC staff to direct the DCI in any way. On the contrary, the staff's Senior Director for Intelligence Programs stated at his deposition, "I don't have the ability to issue instructions or directions to agencies. I would merely convey a decision made by the President or by the National Security Adviser or Deputy National Security Adviser on behalf of the President."

We conclude that the NSC staff does not "direct" the CIA in the conduct of its business, nor tell the DCI what to do except insofar as it may relay the decisions of the President and his senior advisers on the statutory Council. Indeed, we find it inconceivable that the DCI, who himself sits on the Principals Committee (the senior interagency decision-making group for national security policy), would take direction from a member of the NSC staff acting on his or her own behalf.

The larger battle between the parties is not over the statute in any event; it is over various presidential delegations to the NSC. The district court, observing that successive presidents have, through a series of Executive Orders and National Security Decision Directives (NSDDs), expanded the NSC's involvement in the areas itemized in the Act, concluded that the NSC has accreted author-ity to act independently in a variety of areas. It is this position that Armstrong defends most expansively on appeal.

In the Government's view, the district court mistook the gradual expansion of the NSC's advisory and assisting functions for the delegation of independent authority. Indeed, we are told, successive presidents expanded the NSC's responsibilities not in order to hypothecate their powers but, on the contrary, the better to secure their personal control over the fragmented national security apparatus. This interpretation finds direct support in the report of the Tower Commission, which, in the course of examining possible involvement by NSC staff members in the Iran–Contra matter, concluded that the NSC "has from its inception been a highly personal instrument of the President" and "remain[s] a strictly advisory body." John Tower et al., *Report of the President's Special Review Board,* at II–1, II–2 (1987).

Armstrong argues that the President has delegated authority to the NSC in a number of specific areas. We review below his best examples, each of which the Government vigorously disputes. We conclude that, notwithstanding Armstrong's detailed efforts to document a decisional role for the NSC staff, the staff exercises no substantial authority either to make or to implement policy. Insofar as the staff has been delegated authority to make policy recommendations for approval by the President, his NSA, or the statutory Council, the staff's functions are, of course, quintessentially advisory. Likewise, to the extent that the NSC assists the President in coordinating the activities of the various agencies with national security responsibilities, it exercises no authority of its own.

*Protection of national security information.* Executive Orders 12,333 and 12,356 respectively authorize the NSC (1) to provide "review of, guidance for, and direction to, the conduct" of intelligence activities, and (2) to "provide overall policy direction for the information security program." According to Armstrong, these (to us rather cryptic) delegations make the NSC the administrative court of last resort for resolving disputes over what information can be released to

government · contractors and disputes between agencies concerning the protection and declassification of classified information. The NSC offers a different perspective on its role: In providing overall policy direction and carrying out the referenced Executive Orders, the NSC merely monitors other agencies in order to assure that the objectives of the President, who retains ultimate authority over classified information, are achieved. Specifically, the NSC states that its declassification reviews, although described by the district court as "adjudicatory," 877 F.Supp. at 702, are really nothing more than the internal management of the information that the NSC generates in advising the President.

At oral argument, Armstrong took strong exception to this last assertion. He contends that the NSC's declassification function extends to all "material produced or processed for the NSC staff, even if not originally classified by an authorized member of the staff." That is, some of the material subject to NSC declassification is held by other agencies. If so, then the NSC would seem to be exercising discretionary authority beyond the internal management of its own information.

When pressed for an example, Armstrong referred the court to § 3.1(c) of Executive Order 12,356, in which the President authorized the NSC to hear appeals from the decisions of the Information Security Oversight Office, an entity outside the NSC with jurisdiction over declassification procedures. In response to a question from the bench, however, Armstrong conceded that he is aware of no instance in which the appellate process has been invoked. We are reluctant to consider the mere formality of a delegation of authority, unexercised and for all that appears, therefore, of no consequence, the indicium of an entity with substantial independence from the President.

Moreover, in April 1995 President Clinton issued a new directive, replacing Executive Order 12,356 and transferring overall policy direction for information security to the Director of the Office of Management and Budget, in consultation with the NSA. Armstrong is therefore limited to arguing that the NSC was an agency by virtue of the Executive Order when the records at issue in this action were created.

Our dissenting colleague goes further, however. Focusing upon a regulation promulgated under the since-revoked Executive Order that authorized the NSC to decide whether a federal agency should be granted a waiver permitting it to use a non-standard security form for access to classified information, 32 C.F.R. § 2003.20(k), Judge Tatel suggests not only that we look to whether the NSC was an agency when the disputed records were produced, but also that the regulation may remain in effect notwithstanding the revocation of Executive Order 12,356 and the issuance of Executive Order 12,958. Our response is twofold: First, the burden is upon Armstrong to show that a regulation issued pursuant to a superseded Executive Order remains in effect, and he has not even tried to do so. Second, we are not asked in this round of litigation to resolve the status of particular documents; instead, we must declare whether the NSC is an agency subject to the FOIA and the FRA. In reaching that judgment, we apply the law in effect at the time we render our decision. *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).

*Telecommunications policy.* Armstrong argues next that the NSC has a non-advisory role in controlling the National Communications System—a consortium of entities responsible for providing communications for the federal government under emergency conditions, including nuclear attack. By virtue of a regulation issued by the Federal Communications Commission, under the authority of the Communications Act of 1934, 47 U.S.C. § 606, and various other statutes, the NSC has "[a]uthority to develop plans, policies, and procedures for the establishment of ... priorities" aimed at restoring communications services in a national emergency. 47 C.F.R. §§ 211.1(b), 211.6(g). Control over the National Communications System is not, however, assigned to the NSC; the presidentially appointed "Executive Agent" is the Secretary of Defense. Exec. Order 12,472 § 1(e). Armstrong maintains

that while the Secretary has been delegated authority over some specified matters involving telecommunications, the NSC is responsible for other matters. *See* National Communications System Directive 2–1 § 8. The NSC counters that whatever authority it has over telecommunications it does not exercise autonomously; *i.e.*, the NSC may propose, but it is for the President to approve, policy in this area.

The governing regulations and Executive Order 12,472 establish that the NSC participates in setting priorities for the restoration of telecommunications during a national emergency—priorities that may bind even non-governmental telecommunications common carriers and users. *See, e.g.*, 47 C.F.R. § 213.0(b). Armstrong has not, however, established that any of this authority can be exercised without the consent of the President, and the NSC cannot be deemed an "agency" if it does not exercise some substantial non-advisory authority of its own.

Our dissenting colleague asserts that because 47 C.F.R. § 213.7(g) provides that certain telecommunications "authority is reserved to the National Security Council" in the event of an emergency, Armstrong has satisfied his burden of showing that the NSC can exercise such authority without the consent of the President. The regulation affords a scant basis upon which to conclude that the NSC can act, independent of the President, should an emergency arise. Nor is there any support for the dissent's view that the NSC, merely by developing the telecommunications plan set forth in 47 C.F.R. §§ 201–16, has already demonstrated substantial independence of the President. The development of a plan, without more, does not attest to its independent preparation much less to its adoption without the consent of the President or his NSA.

*Emergency preparedness.* The President has delegated to the NSC some authority over emergency preparedness and crisis management, *see* Exec. Order 12,656 § 104(a), and instructed all departments and agencies with responsibility for national defense preparedness to adhere to NSC "policy and guidelines" in that area. Exec. Order No. 12,919 § 104(c). The NSC nonetheless

disclaims any autonomous role in emergency preparedness policy-making, that is, any role beyond providing advice and assistance to the President. Instead, the NSC claims that it serves simply as "the principal forum" for consideration of policy (quoting Exec. Order No. 12,656 § 104(a)).

In reply, Armstrong points to NSDD 188, which establishes a Senior Interagency Group (SIG) for National Security Emergency Preparedness, reporting to the President through the NSC. This group, which is chaired by the National Security Adviser, is authorized—again rather cryptically, it seems to us—to "oversee the implementation of the goals and principles" involved in emergency mobilization planning. When asked at oral argument whether there is anything in the record to indicate what the SIG actually does, Armstrong conceded that there is nothing before us to confirm that the SIG in fact oversees anything or anyone. In any event, for the NSC to serve as an intermediary between the President and a group that "oversee[s] the implementation of ... goals and principles" set by the President is not to implement those goals itself. We are hesitant to conclude that merely "overseeing" (if it does) and reporting to the President upon the activities of others are functions sufficiently distinct from advising and assisting the President to weigh in favor of treating the NSC as an agency subject to the FOIA.

*Non-proliferation.* Both Armstrong and the dissent argue that the NSC exercises authority, independent of the President, in the area of nonproliferation because the NSC examines and makes recommendations to the Department of Commerce regarding export license applications. We disagree. First, if the Departments of Commerce and Energy make an initial determination that an examination is necessary, 15 C.F.R. pt. 778, supp. 1 (1995), that examination is actually undertaken not by the NSC but by an ad hoc interagency working group that may not even qualify as an "establishment within the executive branch." *Meyer*, 981 F.2d at 1293 ("The President does not create an 'establishment' ... every time he convenes a group of senior staff or departmental heads to work on a problem"). Second, although the NSA

acknowledges that the working group is part of the NSC, he also notes that a "Special Assistant to the President . . . represents the President on each [group] . . . [and he] takes his direction from me or my Deputy, on behalf of the President." Finally, the Secretary of Commerce must consider, but is not bound by, the recommendation of the working group. 50 U.S.C.App. § 2409(f)(1)(1994).

The dissent dismisses this last point on the ground that the APA treats as an agency even an entity whose decisions are "subject to review by another agency." 5 U.S.C. § 551(1). That obliterates the distinction between making a decision that will be implemented unless it is disapproved upon appeal to a higher authority, and rendering advice that will not be implemented unless it is affirmatively adopted by that authority. Furthermore, Judge Tatel's suggestion that there is no material difference between *ex ante* approval and *ex post* review equates "preview" (to view in advance) with "review" (to view again). Quite clearly, the NSC's recommendations are previewed, not reviewed, by the Department of Commerce before they are adopted.

*Public diplomacy.* In NSDD 77 the President directed an interagency Special Planning Group, chaired by the National Security Adviser, to engage in "diplomatic and technical planning relative to modernization of U.S. international broadcasting capabilities, the development of anti-jamming strategies and techniques, planning relative to direct radio broadcast by satellite and longer term considerations of the potential for direct T.V. broadcasting." This Special Planning Group is "responsible for the overall planning, direction, coordination and monitoring of implementation of public diplomacy activities." *Id.* The NSC coordinates the work of four standing committees of the Special Planning Group, each of which is chaired by a member agency.

Armstrong argues that NSDD 77 vests in the NSC authority to "direct" public diplomacy programs. The Government responds that NSDD 77, while it does contemplate that the interagency Planning Group will be supported by NSC staff, does not assign substantive authority to the NSC; all activities are carried out by the member agencies.

From NSDD 77 itself we think it quite clear that ultimate authority to set objectives, determine policy, and establish programs rests elsewhere than with the NSC. Armstrong would have the court equate a monitoring function to the authority to establish and implement programs. As we see it, however, the President uses the NSC to provide the direction and coordination necessary to secure conformity to overall goals fixed by the President. That is not a delegation of substantial authority for the NSC to act independently of the President.

Our dissenting colleague suggests that the reviewing function of the Special Planning Group is "sufficiently similar to the evaluative function that we found warranted treating the OST as an agency in *Soucie*." Even if we were to agree with that assessment, it is simply not relevant to the NSC. (Recall our emphasis in *Meyer* upon the "interrelated" nature of the three factors set out there. 981 F.2d at 1293.) That the Special Planning Group may review the activities of four permanent coordinating committees is not sufficient to offset the essential identity between the statutory Council and the President—an identity distinctive to the NSC and completely without parallel at the OST.

Further, Judge Tatel elaborates the responsibilities of two of the committees supervised by the Special Planning Group, and concludes that activities such as "training private groups to encourage the growth of democratic institutions" and "planning and coordination of international broadcasting" constitute substantial delegations of authority to act, independent of the President. According to the dissent, "[t]he key question is not who sets the goals toward which an entity works, but whether an entity itself takes action in furtherance of executive branch goals." Therein lies the crux of our disagreement.

In determining whether an entity is an agency we do not lump together all its activities that advance any goal of the executive branch. Rather we distinguish between advising and assisting the President on the one hand and exercising independent authority

on the other. The question is not only whether the President sets the goal, but the generality of that goal; the more general the goal the greater the likelihood that the responsible entity is vested with some element of discretion and is not just advising or assisting the President. Neither Armstrong nor the dissent has demonstrated that the Special Planning Group or any of the four interagency committees that it supervises is vested with sufficient discretion to say that it exercises authority, independent of the President.

### 4. Summary and Conclusion

We determined first that the NSC has the self-contained structure necessary for it to be considered an executive establishment, and second that structure, standing alone, is not sufficient to overweigh the significance of the close proximity—indeed the essential identity—between the statutory Council and the President. Only with a strong showing that the NSC staff exercises substantial independent authority, therefore, could Armstrong succeed in portraying the NSC as an agency subject to the FOIA.

We conclude that on the record before us Armstrong has not carried his burden of showing that the NSC exercises meaningful non-advisory authority. Most clearly, the Congress has not itself (i.e., by statute) delegated substantial authority to the NSC. Armstrong therefore rests his case principally upon such delegations as successive presidents have made in various Executive Orders and National Security Decision Directives. Under none of these, however, does the NSC appear to exercise any significant non-advisory function.

Armstrong has shown that the NSC staff has authority to review requests for document declassification, and has apparent authority to decide appeals from decisions of the ISOO, but the record is silent upon the question whether the NSC uses that authority and does so without direct supervision by the President. Armstrong has also pointed to delegations from the President to the NSC of functions in telecommunications, non-proliferation, and public diplomacy; but he has not shown that the NSC plays a substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President. When arrayed against the overwhelming fact that the President is the head of the NSC, more is required to demonstrate that these staff activities cast the NSC in any role outside its statutory assignment to advise and assist the President. Therefore, we hold that under the three-part test of Meyer, the NSC is not an agency subject to the FOIA.

### B. Past Conduct and Statements

Armstrong also suggests that, quite apart from the Meyer test, the NSC's own past statements and conduct demonstrate that the NSC has functions in addition to those of advising and assisting the President. See Soucie, 448 F.2d at 1075 (prior conduct weighed in assessing whether entity is an agency). Armstrong cites these recent examples: (1) the Executive Secretary's 1993 staff memorandum on recordkeeping stating that "the NSC both advises and assists the President and is an agency"; (2) the Joint Statement of Facts submitted to the district court in this case, in which the parties state that the NSC's "responsibilities include ... performing independent functions set forth in the governing statute, as well as in regulations and Executive Orders"; and (3) the NSC's memorandum in support of its motion to dismiss a previous case brought by Armstrong, in which the NSC reports having responsibilities in the "management of the interagency process for national security affairs". Armstrong notes also that each Administration has left behind so-called institutional records of the NSC, which the NSC has managed under the FRA rather than the PRA; he claims that the NSC thereby implicitly conceded that it is an agency.

According to the Government, these examples of the NSC's past statements and conduct do not have the significance that Armstrong claims for them. First, the Executive Secretary's recordkeeping memorandum was intended to guide NSC staff members in creating, maintaining, and preserving records in conformity with the OLC's legal opinion, then prevailing within the Executive Branch, that the NSC was an agency. That opinion

was reversed some months later. Second, the NSC's submissions in earlier rounds of this litigation can hardly be read to concede the central point in contention here. In the Joint Statement of Facts, the NSC was just acknowledging that it does a variety of things pursuant to the delegations listed therein; in the memorandum of law supporting the Government's motion to dismiss the prior case, it acknowledged only a coordinating role ("management of the interagency process") typical of an entity within the Executive Office of the President acting on behalf of the President in relation to the agencies with operating responsibilities. As to Armstrong's third point, about "institutional records," the NSC responds that every president has treated most of the NSC's records as presidential records and removed them at the end of his administration. That the NSC, in the interests of permitting public access to some NSC records and ensuring a smooth transition on national security matters, voluntarily subjected certain of its records to the FOIA and the FRA does not reflect any intention to concede, and should not be taken to establish as a matter of law, that the NSC is subject to those statutes.

We agree with the Government on this point as well. The NSC's prior references to itself as an agency are not probative on the question before the court—whether the NSC is indeed an agency within the meaning of the FOIA; quite simply, the Government's position on that question has changed over the years. Moreover, as Armstrong conceded at oral argument, even as the NSC was treating some of its institutional records as though they were subject to the FOIA and the FRA, it was declining to treat other records in that way. In sum, the NSC's past behavior has been inconsistent—both logically and factually—and therefore does not illuminate the legal question here in dispute.

Finally, the district court held in the alternative that the NSC did not set forth, in the March 25, 1994 memorandum from William H. Itoh to William H. Leary, a reasoned explanation for its change of position on the question whether it is an agency, and that this is a sufficient ground in itself, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), to set aside the Government's newly adopted position as arbitrary and capricious. 877 F.Supp. at 706 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983)). Armstrong made no such argument in district court, nor does he defend the judgment of the district court upon this alternate ground. In any event, invocation of the APA begs the question whether the NSC is an "agency" within the meaning of that term as it is used in the APA. *See* 5 U.S.C. § 551(1) (agency defined as "each authority of the Government of the United States"). Because we have concluded that the NSC is not, after all, an agency subject to the FOIA, the district court's alternative rationale, regardless of its provenance, is now moot.

## C. The Legislative History of the PRA

Before concluding, we respond to the suggestion elaborated at some length in the dissent that the status of the NSC as an agency could be resolved by looking instead to the legislative history of the PRA rather than to our own prior cases. The argument, in brief, goes like this: When the Congress enacted the PRA in 1978, both the Congress and the President were aware that the NSC complied with the FOIA. Moreover, the Congress intended that any agency which, apparently like the NSC, "is now subject to the FOIA would remain so." H.R. REP. No. 1487, 95th Cong., 2d Sess. 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5742. Accordingly, by its express terms, the PRA excluded from coverage any documentary materials that are official records of an agency subject to the FOIA. 44 U.S.C. § 2201(2)(B). Ergo, for us to hold that the NSC is not an agency within the meaning of the FOIA, and is therefore subject to the PRA rather than to the FRA, is contrary to the intent of the Congress that passed the PRA.

The legislative history of the PRA also reveals, however, that the Congress intentionally aligned the definition of "agency" in the FOIA with the test we had announced in *Soucie*. *See Meyer*, 981 F.2d at 1291 ("As clearly shown by the legislative history . . . Congress intended to codify our earlier deci-

sion ... in *Soucie*"); H.R. CONF. REP. No. 1380, 93d Cong., 2d Sess. 14–15 (1974). By incorporating the *Soucie* test, the Congress made a deliberate decision to forego specifically listing the NSC and other EOP units as agencies, as had been done in the House Report. H.R. REP. No. 876, 93d Cong., 2d Sess. 8 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6274. Instead, the Congress adopted a flexible, judicially-created test and handed the matter back to the courts, anticipating that we would continue to shape and refine the basic *Soucie* definition—as indeed we did when we established the three-factor test in *Meyer*. There is nothing to indicate that the Congress intended specifically to define the NSC as a FOIA agency apart from a judicial determination to that effect.

### III. Conclusion

Based upon the record before this court, we conclude that the NSC is not an agency under the FOIA and, therefore, that its records need not be managed in compliance with the FRA. The NSC has a self-contained structure, but the proximity of the NSC's operations to the President, who chairs the statutory Council, is more significant; the close working relationship between the NSC and the President indicates that the NSC is more like "the President's immediate personal staff" than it is like an agency exercising authority, independent of the President. Accordingly, for Armstrong to prevail, his showing regarding the nature of the authority delegated to the NSC must be compelling, which on this record it is not. For the foregoing reasons, the judgment of the district court that the NSC is an agency under the FOIA is

*Reversed.*

TATEL, Circuit Judge, *dissenting*:

The court today concludes that the National Security Council does not exercise sufficiently independent authority to be an "agency" for purposes of the Freedom of Information Act, 5 U.S.C. § 552 (1994), and the Federal Records Act, 44 U.S.C. §§ 2101–18, 2901–09, 3101–07, 3301–14 (1994). I respectfully disagree. The NSC, an entity within the Executive Office of the President that complied with FOIA during the administrations of Presidents Ford, Carter, Reagan, and Bush, declared itself exempt from FOIA only recently while this litigation was pending. In my view, the record demonstrates that the NSC exercises, in areas such as information security, telecommunications, non-proliferation, and public diplomacy, just the sorts of independent authority that our cases hold satisfy the requirements of the FOIA definition of "agency." Holding the NSC subject to FOIA and the Federal Records Act is consistent with those statutes and their purposes. Moreover, FOIA's exemption for national security materials, combined with the inapplicability of FOIA and the Federal Records Act to certain materials produced by NSC members who hold separate non-NSC positions, such as in the Office of the President or the Office of the Vice President, ensures that the NSC's compliance with these statutes would not interfere with the President's development of foreign policy.

### I.

Our task in this case is to determine whether the NSC is an agency for purposes of the Federal Records Act and is therefore subject to the records disposal guidelines set forth in that statute. Because the same documents cannot simultaneously be subject to the different requirements of the Federal Records Act and the Presidential Records Act, 44 U.S.C. §§ 2201–07 (1994), *see Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1293 (D.C.Cir.1993) (*Armstrong II*), and because the Presidential Records Act specifies that its coverage and the coverage of FOIA are mutually exclusive, *see* 44 U.S.C. § 2201(2)(B), this court has treated the definition of "agency" in the Federal Records Act as coterminous with the FOIA definition of "agency," *see Armstrong II,* 1 F.3d at 1293. We have also held that, in light of the suggestion in FOIA's legislative history that Congress intended to adopt this court's approach in *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971), FOIA's definition of "agency," though literally including "*any ...* establishment in the executive branch of the

Government (including the Executive Office of the President)," 5 U.S.C. § 552(f) (emphasis added), does not include EOP units whose sole functions are to advise and assist the President or that do not exercise "substantial independent authority." *See Rushforth v. Council of Economic Advisers,* 762 F.2d 1038, 1040–43 (D.C.Cir.1985); *Soucie,* 448 F.2d at 1073, 1075. Although these two formulations of the *Soucie* rule—the "sole function" test and the "substantial independent authority" inquiry—might conceivably point in different directions for certain entities, *see* Maj. op. at 557–58, our precedents seem to require us to view them, to the extent possible, as essentially opposite sides of the same coin. In other words, if an entity has some significant function apart from advising and assisting the President, then we should view the agency as exercising substantial independent authority and therefore as a FOIA agency.

### A.

In *Meyer v. Bush,* 981 F.2d 1288 (D.C.Cir. 1993), we held that in determining whether an entity within the Executive Office of the President that "help[s] the President supervise others in the executive branch" exercises substantial independent authority, we should focus on three factors: the unit's proximity to the President, "the nature of its delegation from the President," and "whether it has a self-contained structure." *Id.* at 1293. We treated the three factors not as elements to be weighed against each other as in a balancing test, but rather as keys to understanding the nature of an EOP unit's functions in order to determine whether the unit exercises substantial independent authority apart from advising and assisting the President. Although I agree with the court's conclusion that the NSC has a self-contained structure—*Meyer*'s final factor—I think the court fails to appreciate the functional nature of the *Meyer* inquiry in its analysis of the first two factors.

Regarding the first *Meyer* factor—proximity to the President—I certainly agree with my colleagues that, in light of the President's membership on the NSC, the NSC is proximate to the President. In my view, that conclusion should simply be a starting point for our consideration of the second *Meyer* factor; we still must analyze how the President's membership on the NSC affects that entity's functions. With all due respect, I fear the President's membership on the NSC has obscured from my colleagues the extent to which the NSC actually exercises independent authority.

In *Meyer,* we "assume[d] ... that Congress intended the phrase 'solely to advise and assist' the President to refer to entities whose characteristics and functions were similar to those of the President's immediate personal staff." *Id.* In other words, the EOP units that Congress meant to exclude from the coverage of FOIA are those as close operationally to the President as his personal staff. Apparently to make clear that proximity to the President is important to the extent that it suggests something about function, we explained that the proximity factor referred to a unit's "continuing interaction" with the President. *Id.*

Generally, an entity's proximity to the President makes it more likely that its functions are advisory. That is, the closer an entity is to the President, the less likely we are to find truly independent authority; the further from the President, the more likely the entity's authority is truly independent. The entity at issue in *Meyer,* the Task Force on Regulatory Relief, was a small committee operating in such close proximity to the President that none of its decisions could fairly be described as independent of him. *See id.* at 1294. The NSC has a more complex structure than the Task Force. On the one hand, the President himself is a member of the NSC. On the other hand, the NSC is a much larger entity, many of whose parts are not nearly as close to the President as was the Task Force in *Meyer.* According to the reasoning underlying *Meyer*'s proximity factor, then, while we should expect some NSC functions to be akin to those of the President's personal staff, we should not be at all surprised to find independent functions exercised by the less proximate NSC staff and numerous NSC interagency groups. Even with the President as a member, the NSC is a legal entity distinct from the President, and

the record indicates that responsibilities delegated to the NSC are in fact carried out without the personal involvement of the President.

It is with respect to the remaining element of the *Meyer* inquiry—the nature of the authority delegated to an EOP unit—that I part most significantly from the court's approach. In my view, the greatest challenge posed by the *Soucie* and *Meyer* tests is reading the phrase "advise and assist the President" in a meaningful but not overly broad way. A host of executive branch activities that Congress subjected to FOIA can also be viewed as activities that "assist the President," for surely the President is assisted in executing the laws by every delegation of power that he makes. *See Meyer,* 981 F.2d at 1293. As we made clear in *Meyer,* we must not allow the "advise and assist" exception to swallow the FOIA rule. That is exactly what I fear the court has done today.

Apparently because of the President's membership on the NSC, the court treats the *Meyer* delegation prong in what I believe to be an unrealistic fashion, expecting Armstrong to demonstrate that NSC activities reflect a sort of independence from the President that neither FOIA nor our cases envision as a requirement for FOIA agencies. For example, I think the court makes too much turn on whether an entity may act without the consent of the President. The court suggests that an entity cannot have "substantial non-advisory authority of its own" unless it may exercise its authority "without the consent of the President." Maj. op. at 563. Although saying that an entity does not seem "independent" if it must obtain consent before acting makes a certain amount of linguistic sense, this cannot be what our cases mean by "independent." To be an agency under the Administrative Procedure Act (and thus FOIA), an entity does not need to be able to act without consent. The APA definition of "agency"—which is less encompassing than the FOIA definition—includes "each authority of the Government of the United States, *whether or not it is within or subject to review by another agency.*" 5 U.S.C. § 551(1) (1994) (emphasis added). Nothing in the APA definition suggests that it excludes entities that, before taking action, must submit plans for review and approval by another agency. That is, even an entity that acts only with the consent of another agency could still be an agency under the APA and thus under FOIA. Crucial to the "agency" inquiry is not whether an entity is unaccountable to all other agencies within the executive branch, but whether the entity has the power to act provided no higher authority disapproves.

This case, of course, does not concern an executive branch entity that must obtain the consent of another agency, but an entity within the Executive Office of the President that may under certain circumstances have to obtain the consent of the President, who is not an "agency" under the APA, *see Franklin v. Massachusetts,* 505 U.S. 788, 796, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). That an entity's actions are subject to the President's consent is hardly unusual and should certainly not be a basis for exempting an entity from FOIA. I doubt that any President would permit an EOP unit to act against his will or that other executive agencies would comply with any order from an EOP unit thought not to reflect either the President's wishes or his general policies; yet FOIA clearly specifies that EOP units can be "agencies" under the statute. The problem with the court's view of consent is that the very notion of agency embodies consent. As the Government argued in an earlier stage of this litigation, "An 'agency' is generally understood as being responsible to a 'principal': it is the instrumentality through which another works. The President ... is the principal in the executive branch to whom agencies are responsible." Brief for Appellants at 19, *Armstrong v. Bush,* 924 F.2d 282 (D.C.Cir.1991) (No. 90–5173) (citation omitted).

The court's focus on consent risks treating FOIA as if it were more concerned with decisionmaking than with decision implementation. Nothing in FOIA contains any such indication. FOIA gives private citizens access to information from executive branch agencies that do the work of government. Its "sole function" exception excludes only a small subset of entities within the Executive

Office of the President that do not themselves "do" anything apart from advising the President and assisting him in what he does.

In determining whether an EOP unit exercises independent authority or only advises and assists the President, I would therefore focus on whether the unit actually takes action itself, as opposed to taking steps simply to assist the President in taking action. For example, a unit within the Executive Office of the President might be viewed as merely assisting the President if its activities prepare the President for action or facilitate his actions. In contrast, if the President actually delegates to the unit responsibility for taking certain action itself, then the unit is not simply assisting the President to take action, but is itself exercising delegated authority. If the entity is itself taking action, then it matters little that the President retains power to approve or disapprove the entity's action. Indeed, if the President were to delegate an enormous amount of authority to an entity within the Executive Office of the President with the understanding that the entity would submit weekly proposals of its actions for the President's approval, the mere fact that the entity could not act without the President's consent would not be grounds to exempt that entity from the coverage of FOIA or the Federal Records Act as long as it is the entity itself that acts. To the extent that the entity does the work of government—exercising authority in a way that has concrete effects either on the interests of private citizens or on other parts of the government—the entity is engaging in just the sort of official activity that the Federal Records Act and FOIA were designed to bring into public view.

### B.

In my view, the court's failure to appreciate the functional focus of the *Meyer* inquiry has led it to the erroneous conclusion that the NSC does not exercise substantial independent authority apart from advising and assisting the President. Although a court applying the "sole function" test need find only one non-advise-and-assist function to conclude that an EOP unit is an agency for FOIA and Federal Records Act purposes, I describe below several examples of significant non-advise-and-assist functions carried out by the NSC that should render it an agency.

### Information Security

The record persuasively demonstrates that the NSC has repeatedly performed a classic agency adjudicatory function in deciding whether waivers should be granted to permit federal agencies to use non-standard security forms. Federal regulations establish that, as part of a "government-wide information security program" to "enhance the protection of national security information and/or [to] reduce the costs associated with its protection," executive branch departments and independent agencies must use a standard non-disclosure form (or one of its predecessors). 32 C.F.R. § 2003.1 (1995). The regulations require that all employees of executive departments and independent agencies, as well as employees of government contractors and licensees, sign a standard security form "before being granted access to classified information." § 2003.20(b)-(c). Agencies may also require other persons to sign the standard form before obtaining such access. § 2003.20(d). According to the regulations, although use of the standard form by departments and agencies is "mandatory," § 2003.2, an agency may request a waiver from the requirement of using the standard form. § 2003.20(k). The regulations provide that "[o]nly the National Security Council may grant an agency's request for a waiver from the use of the [standard form]." *Id.* An agency requesting a waiver must submit a proposed alternative to the Director of the Information Security Oversight Office ("ISOO"), who, after consulting with the Department of Justice on the enforceability of the proposed alternative agreement form, will "mak[e] a recommendation to the National Security Council." *Id.*

The record in this case documents several instances in which the NSC has exercised this independent function. It approved waivers for the Central Intelligence Agency (after a dispute between that agency and the ISOO), for the National Security Agency, and for the Board of Governors of the Federal

Reserve System. In the course of the present litigation, the Government has admitted that "[o]fficials of the NSC approve or disapprove requests for waiver from the obligation to use standard forms prescribed by 32 C.F.R. Part 2003, without the personal involvement of the President." Supplemental Responses of Defendant to Plaintiffs' First Set of Requests for Admission, *Armstrong v. Executive Office of the President,* 877 F.Supp. 690 (D.D.C.1995) (No. 89–0142). Although the Government argues that "it is the National Security Advisor, in his role as the President's advisor, who performs the key functions of approving" waivers, Brief of Appellants at 34, the record demonstrates that the NSC staff reviews waiver requests and the Executive Secretary of the NSC signs grants of waivers. Significantly, the relevant regulation does not give this power to the National Security Advisor, but rather states that "[o]nly the National Security Council may grant" such waivers. 32 C.F.R. § 2003.20(k). This function alone—exercising the power, without the personal involvement of the President, to decide whether executive branch and independent agencies may use non-standard security forms—would be sufficient to render the NSC an agency.

Whether the regulation that gives the NSC the power to grant these waivers is still in effect is not entirely clear. The ISOO issued the regulation pursuant to section 5.2(b)(7) of Executive Order No. 12,356, which in 1983 gave the ISOO Director "the authority to prescribe, after consultation with affected agencies, standard forms that will promote the implementation of the information security program." Exec. Order No. 12,356, § 5.2(b)(7), 3 C.F.R. 166, 176 (1983), *reprinted in* 50 U.S.C. § 435 (1994). Under Executive Order No. 12,356, the NSC had responsibility for "overall policy direction for the information security program." *Id.* § 5.1(a), 3 C.F.R. at 175 (1983), *reprinted in* 50 U.S.C. § 435. In 1995, President Clinton revoked Executive Order No. 12,356. *See* Exec. Order No. 12,958, 60 Fed.Reg. 19,825, at 19,843 (1995). Executive Order No. 12,958 gave the Director of the Office of Management and Budget authority to issue directives to implement the order and placed the ISOO within the OMB. *See id.* §§ 5.2(a), 5.3, 60 Fed.Reg.

at 19,838–39. Although Executive Order No. 12,958 gave the Director of the ISOO "the authority to prescribe, after consultation with affected agencies, standardization of forms or procedures that will promote the implementation of the program established under this order," *id.* § 5.3(b)(7), 60 Fed.Reg. at 19,-839—a delegation similar to the one in Executive Order No. 12,356 under which the ISOO issued the regulation originally giving the NSC final responsibility over waiver decisions—the NSC may no longer retain this power under Executive Order No. 12,958.

Nevertheless, even if the NSC no longer has the power to rule on these waiver requests, it exercised substantial, independent authority without the involvement of the President, and was thus an agency, when it did have this authority—including when some of the records at issue in this lawsuit were produced. Because a functional test serves to determine whether an entity is an "agency" for purposes of FOIA and the Federal Records Act and because presidential delegations of authority can suffice to render an entity an agency, executive orders can have the effect of bringing an entity within or outside the coverage of FOIA. The "sole function" test requires that, to be exempt from FOIA, an EOP unit have no significant non-advise-and-assist functions. Therefore, the NSC's waiver authority, when it existed, was alone sufficient to bring the NSC within FOIA's definition of "agency."

The court's citation of *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), for the proposition that "we apply the law in effect at the time we render our decision," Maj. op. at 562, is beside the point. *Bradley* presented the question whether a statute enacted during the course of a particular lawsuit should be applied to that lawsuit. *See Bradley,* 416 U.S. at 709–11, 94 S.Ct. at 2015–16. In the present case, the relevant "law [that is] in effect at the time we render our decision" and that we must apply to the facts in the record is the FOIA definition of "agency." Armstrong seeks access to NSC records dating from the mid–1980s. The question before us, then, is whether the NSC is now or was for any time since the mid-

1980s an agency under the FOIA definition. The court's effort to discount the relevance of a delegation of authority that may no longer be in effect is unpersuasive. In any event, as I explain below, I think that other NSC functions are enough to render the NSC an agency even if the NSC no longer has power to rule on security form waiver requests.

### Telecommunications

The NSC possesses and has exercised substantial independent authority in the area of telecommunications. Together with the Office of Science and Technology Policy, the NSC has published extensive plans for telecommunications regulation "during crises and emergencies." *See* 47 C.F.R. §§ 201–216 (1995). Included among these plans is a "precedence system for the expeditious handling of messages and calls transmitted over Government and public correspondence facilities in all types of situations from peacetime to massive nuclear attack." § 213.1(a). With the Federal Communications Commission, the NSC has established a "Priority System for Intercity Private Line Services" in order to protect "[p]rivate line services for military, governmental, and other essential users." § 213.7(g) (citing FCC Order 67–51). These telecommunications plans provide that during emergencies, although communications common carriers will normally be permitted to "use their judgment in determining" how many circuits to devote to categories of public correspondence entitled to precedence over other messages and calls, "the authority is reserved to the National Security Council or the Federal Communications Commission, as appropriate to the time and situation, to revise the decisions of the carriers respecting the allocation of circuits, and to resolve any questions which are referred to them by the carriers or the users." *Id.* Thus, during national emergencies, the NSC has authority to decide whether communications common carriers have devoted adequate circuits to public correspondence deserving precedence and to resolve other questions referred by carriers or the users of their services. To me, this is a classic example of substantial independent authority.

In rejecting the NSC's emergency telecommunications responsibilities as substantial independent authority, the court states that "Armstrong has not ... established that any of this authority can be exercised without the consent of the President." Maj. op. at 563. The court offers no explanation, however, of what it would have Armstrong show. If the court means that Armstrong must show that the NSC is not obligated to obtain the President's consent each time it exercises its authority, Armstrong has satisfied this burden: The regulation clearly states that the relevant "authority is reserved to the National Security Council or the Federal Communications Commission, as appropriate to the time and situation." 47 C.F.R. § 213.7(g). The plain language of the regulation thus gives the NSC, where appropriate for it to act instead of the FCC, the authority to act without first seeking the President's consent. If the court means that Armstrong must show that the NSC may exercise its authority even over the objection of the President, then the court has created an impossible hurdle. No EOP unit can be "independent" of the President in the way that independent agencies outside the executive branch can.

Proposing another possible reason to discount the NSC's telecommunications responsibilities, the Government argues that responsibilities shared with other entities cannot suffice to bring the NSC within FOIA. This argument has no foundation in either the statute or the "sole function" test. The *Meyer* test is premised in part on the notion that, in order for an EOP unit to be considered an agency, it must not be too similar to the President's personal staff; in other words, the agency must take some sort of action that is independent of the President's action. But nothing in FOIA or the sole function test requires that an agency's authority be independent of authority exercised by another executive branch entity. The fact that a delegation of authority requires two executive branch entities to cooperate in carrying out clearly non-advise-and-assist functions does not mean that the entities exercise no authority sufficiently separate from the President to be "agencies" under FOIA. It simply

means that both agencies exercise such authority together and are thus both potentially subject to FOIA.

One other potential objection to giving weight to the NSC's telecommunications responsibilities is their possibly hypothetical nature. The record does not indicate whether the NSC has ever exercised its authority over communications common carriers during an emergency. I raise this point because, with respect to another NSC function, the court expresses its "reluctan[ce] to consider the mere formality of a delegation of authority, unexercised and for all that appears, therefore, of no consequence, the indicium of an entity with substantial independence from the President." Maj. op. at 561–62. My colleagues express their hesitation with respect to a power—to decide appeals from certain decisions of the ISOO—whose non-exercise is apparently due to the fact that it has been found to be of little or no use. The NSC's telecommunications authority, in contrast, would likely prove very useful and perhaps necessary given the occurrence of certain events, such as a national emergency. I doubt that the Government or the court would suggest that an entity given important responsibilities in the event of a national emergency would not be subject to FOIA until such an emergency took place. Once such an emergency occurred and the entity exercised its contingent authority, the entity certainly would be an agency subject to FOIA. It defies the purpose of FOIA to suggest, however, that the statute Congress passed to bring government operation into more public view would not entitle the public to important information about the entity—including, for example, information about whether it is in fact prepared to carry out its responsibilities in case of a national emergency—until it is too late for the information to be of perhaps its most important use.

Most important, not all of the NSC's telecommunications authority is hypothetical. The NSC has already acted in conjunction with the Office of Science and Technology Policy and the FCC to develop the elaborate telecommunications plan contained in 47 C.F.R. §§ 201–216. In my view, then, the NSC's telecommunications responsibilities

are enough to render it an "agency" for FOIA and Federal Records Act purposes.

### Non-proliferation

The NSC has also been delegated authority to review and make recommendations regarding export license applications. Under regulations implementing section 309(c) of the Nuclear Non-Proliferation Act of 1978, 42 U.S.C. § 2139a(c) (1994), the Secretary of Commerce has the responsibility to initiate procedures for review of export licenses covering "items ... that could be of significance for nuclear explosive purposes if used for activities other than those authorized at the time of export." 15 C.F.R. § 778A.2(a) (1996). According to procedures adopted pursuant to the Non-Proliferation Act, if the Departments of Commerce and Energy believe that an export license application should be denied or reviewed by another agency, these departments must refer the application to the Subgroup on Nuclear Export Coordination ("SNEC") of the NSC Ad Hoc Group on Nonproliferation, which "shall promptly consider any such application and provide its advice and recommendations to the Department of Commerce." *See* Procedures Established Pursuant to the Nuclear Non-Proliferation Act of 1978, pt. F, § 1(b), *reprinted in* 15 C.F.R. pt. 778, supp. 1 (1995) [hereinafter Non-Proliferation Procedures]. If the SNEC reaches agreement on the application, the Commerce Department must consider the SNEC's recommendation, *see* 50 U.S.C.App. § 2409(f)(1) (1994) (requiring the Secretary of Commerce to "take into account any recommendation of a department or agency with respect to [an] application in question"), and must give the license applicant an opportunity to respond to a negative SNEC recommendation, *see* 50 U.S.C.App. § 2409(f)(2) (1994). If the SNEC cannot reach agreement on the application, then the SNEC may refer the matter to the NSC Ad Hoc Group on Non-Proliferation, also an interagency working group, or afterward to the President. *See* Non-Proliferation Procedures, pt. F, § 1(b).

Because the non-proliferation procedures explicitly provide that the President has final authority to resolve interagency disagree-

ments on the SNEC, review by the NSC Ad Hoc Group on Non–Proliferation in the event that the SNEC cannot reach agreement does not qualify as substantial independent authority under *Meyer.* In considering a similar review procedure whereby the Task Force on Regulatory Relief had the option of either resolving interagency disputes itself or referring them to the President, we expressed doubt in *Meyer* that "any ... head of a department or agency who *reports directly* to the President, would acquiesce in a Task Force decision that was thought not to represent directly and precisely the President's opinion." *Meyer,* 981 F.2d at 1295.

This does not settle whether, in those more numerous cases in which the SNEC reaches agreement about an export license application, SNEC application review and SNEC recommendations to the Commerce Department constitute exercises of substantial independent authority. As an initial matter, the SNEC—an interagency working group that includes a nonvoting NSC representative and voting representatives from the Departments of Commerce, Energy, Defense, and State and the Arms Control and Disarmament Agency—is clearly part of the NSC. The Government does not dispute this. *See, e.g.,* Brief for Appellants at 43 n.30. Indeed, the current Assistant to the President for National Security Affairs so stated in a declaration in the record, and President Clinton's Presidential Decision Directive 2 on the "Organization of the National Security Council," dated January 20, 1993, makes clear that interagency working groups are part of the NSC. Second, evaluating applications to determine their propriety is a classic agency function. Because the APA treats as agencies even entities whose decisions are "subject to review by another agency," 5 U.S.C. § 551(1), it matters not that the Secretary of Commerce is bound only to consider the SNEC's recommendations, not to accept them. The SNEC's authority to evaluate export license applications for potential nuclear proliferation risks and make recommendations to another agency is no less "substantial independent authority" than was the Office of Science and Technology's power to evaluate federal research programs, which we held in *Soucie* was sufficient to render

the OST an agency under the APA. *See Soucie,* 448 F.2d at 1073, 1075. Having no power to act upon its evaluations, the OST simply conducted its reviews and made its findings available for other government entities. Finally, SNEC authority to review license applications is far from hypothetical; the parties' joint statement of facts before the district court indicates that the SNEC regularly exercises this authority and that its recommendations have substantial influence in the Commerce Department's review of export license applications. According to the record, the SNEC has reviewed hundreds of license applications under these procedures, and the Department of Commerce uniformly follows the SNEC's recommendations.

### Public Diplomacy

Armstrong has also demonstrated that certain NSC interagency groups have substantial independent authority in the area of public diplomacy. In 1983, National Security Decision Directive 77 established an NSC Special Planning Group chaired by the Assistant to the President for National Security Affairs and including as members the Secretaries of Defense and State, the Directors of the United States Information Agency and the Agency for International Development, and the Assistant to the President for Communications. *See* Management of Public Diplomacy Relative to National Security, NSDD 77 at 1 (Jan. 14, 1983). NSDD 77 provides that the Special Planning Group "shall be responsible for the overall planning, direction, coordination and monitoring of implementation of public diplomacy activities" and "shall ensure that a wide-ranging program of effective initiatives is developed and implemented to support national security policy, objectives and decisions." *Id.* NSDD 77 also creates four interagency committees under the Special Planning Group's supervision. One of these committees, the International Political Committee, is "responsible for planning, coordinating and implementing international political activities in support of United States policies and interests relative to national security." *Id.* at 2. Among its tasks is providing "aid, training and organizational support for foreign governments and private

groups to encourage the growth of democratic political institutions and practices." *Id.* In my view, training private groups to encourage the growth of democratic institutions can be considered "assisting the President" only by defining assisting the President so as to encompass nearly all executive branch activity.

Another of the four committees under the supervision of the Special Planning Group is the International Broadcasting Committee, which is "responsible for the planning and coordination of international broadcasting activities sponsored by the U.S. Government." *Id.* at 3. NSDD 77 specifies that "[a]mong its principal responsibilities will be diplomatic and technical planning relative to modernization of U.S. international broadcasting capabilities" and "the development of anti-jamming strategies and techniques." *Id.* Technical planning of United States international broadcasting capabilities and developing both strategies and techniques for avoiding jamming of United States broadcasts are substantial delegations of authority that are almost certainly independent of any direct involvement by the President.

The court says little about the activities of these committees. Focusing instead on the Special Planning Group that reviews and provides guidance to these committees, the court finds dispositive that the Special Planning Group acts "to secure conformity to overall goals fixed by the President." Maj. op. at 564. Under this reasoning, nearly every EOP unit would be exempt from FOIA and Federal Records Act coverage. One way or another, the President sets goals for all executive branch agencies, including EOP units. The key question is not who sets the goals toward which an entity works, but whether an entity itself takes action in furtherance of executive branch goals. NSDD 77 clearly delegates to the Special Planning Group planning and monitoring responsibilities distinct from the actions of the President. Because it makes special provision for "[p]ublic diplomacy activities involving the President or the White House," requiring that these activities "be coordinated with the Office of the White House Chief of Staff," NSDD 77 at 1, NSDD 77 suggests that the Special Plan-

ning Group has responsibility for public diplomacy activities that do not involve the President. I do not understand how the purposes of the sole function test warrant the conclusion that an entity charged with "the overall planning, direction, coordination and monitoring of implementation of public diplomacy activities," *id.,* has no "substantial independent authority." At the very least, the Special Planning Group's function of "periodically review[ing] the activities of the four permanent coordinating committees to insure that plans are being implemented and that resource commitments are commensurate with established priorities," *id.,* is sufficiently similar to the evaluative function that we found in *Soucie* warranted treating the OST as an agency.

### C.

I think the framers of the Federal Records Act, FOIA, and the Presidential Records Act would be quite surprised to learn from the court's opinion that the Federal Records Act does not cover and FOIA does not guarantee citizens access to nonsensitive NSC documents regarding the request by the Federal Reserve System and other agencies to use nonstandard security forms with their employees and contractors; the NSC's national emergency telecommunications plans; hundreds of reviews of export license applications conducted by an NSC interagency group; and an NSC interagency group's development of anti-jamming broadcast strategies and techniques. These functions—along with other NSC activities—are classic examples of agency action performed without the personal involvement of the President. They are just the sorts of activities that subject an entity to FOIA and the Federal Records Act.

Holding that the NSC exercises substantial independent authority and is subject to FOIA and the Federal Records Act would be perfectly consistent with what those who enacted the Presidential Records Act thought they were doing when they designed the mutual exclusivity of that statute and FOIA. Unlike the Task Force at issue in *Meyer,* an entity created after the passage of FOIA and the Presidential Records Act, the NSC predates both statutes. In applying the legisla-

tive-history-based *Meyer* test, it therefore makes sense to take into account legislative history relevant to the NSC's status, not to sidestep *Meyer* and its elaboration of *Soucie*'s sole function test, but to hold in check this court's application of that test. This is so particularly because the language of the FOIA definition of "agency"—"any . . . establishment in the executive branch of the Government (including the Executive Office of the President)"—clearly covers the NSC and because the only statutory basis for exempting the NSC from FOIA's coverage is a limited exception derived from the legislative history of FOIA. In my view, the legislative history of the Presidential Records Act indicates just how far the court's application of the *Meyer* test has strayed from Congress's commands.

The Presidential Records Act and its legislative history clearly indicate that it was not the purpose of the Presidential Records Act to cover entities subject to FOIA at the time of the Presidential Records Act's passage. In 1978, when the House Report on the Presidential Records Act provided that "that which is now subject to FOIA would remain so," H.R.REP. No. 1487, 95th Cong., 2d Sess. 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5742, Congress was officially on notice of the NSC's compliance with FOIA from two separate sources. The NSC had issued FOIA regulations on February 19, 1975, *see* 40 Fed.Reg. 7316 (1975) (codified at 32 C.F.R. pt. 2101), and, as the record in this case indicates, the NSC had complied in 1975, 1976, 1977, and 1978 with FOIA's requirement that each covered agency annually submit a copy of its FOIA regulations and a report of its administration of FOIA to the Speaker of the House of Representatives and to the President of the Senate for referral to appropriate congressional committees, *see* 5 U.S.C. § 552(e) (formerly § 552(d)). In addition, the record of the 1978 hearings before the House Subcommittee of the Committee on Government Operations includes a report by the Library of Congress's Congressional Research Service concluding that eight EOP units, including the NSC, were agencies for FOIA purposes. *See* LIBRARY OF CONGRESS CONGRESSIONAL RESEARCH SERVICE, APPLICABILITY OF THE FREEDOM OF INFORMATION ACT

TO THE EXECUTIVE OFFICE OF THE PRESIDENT 20 (1978), *reprinted in Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the House Comm. on Gov't Operations,* 95th Cong., 2d Sess. 759, 778 (1978) [hereinafter *Presidential Records Act Hearings*]. The report noted: "The NSC has FOIA regulations and has been the subject of court cases under the Act. The NSC has an active FOIA component." *Id.* at 8, *reprinted in Presidential Records Act Hearings* at 766. The CRS report further stated that, with respect to the Vice President, "it would seem that records generated by his duties as Smithsonian regent or NSC member would be the only records available under the FOIA from the Office of the Vice President, assuming there are such records and they are located in that Office." *Id.* at 18, *reprinted in Presidential Records Act Hearings* at 776. In addition, by the time President Carter signed the Presidential Records Act into law in November 1978, *see* 14 WEEKLY COMP. PRES. DOC. 1965 (Nov. 6, 1978), the Office of Legal Counsel had advised the President in its Memorandum of September 6, 1978 that the NSC is an agency for FOIA purposes. *See* 2 Op. Off. Legal Counsel 197, 205 (1978), *withdrawn,* Memorandum from Walter Dellinger, Acting Assistant Att'y Gen., Office of Legal Counsel, to Alan J. Kreczko, Special Assistant to the President and Legal Advisor, Nat'l Sec. Council (Sept. 20, 1993). Clearly, then, those responsible for the enactment of the Presidential Records Act in 1978—both Congress and the President— were on notice of the NSC's compliance with FOIA and its apparent status as a FOIA agency. Such indications in the legislative history of the Presidential Records Act that those who enacted that statute likely thought that it would not cover the NSC should make us hesitant to rule that Congress did not subject the NSC to FOIA.

Further support for treating the NSC as a FOIA agency may arguably be found in the legislative history of the 1974 FOIA amendments. A House Report noted that the amended FOIA definition of "agency" would include "such functional entities as . . . the National Security Council." H.R.Rep. No. 876, 93d Cong., 2d Sess. 8 (1974), *reprinted*

*in* 1974 U.S.C.C.A.N. 6267, 6274. This court has disavowed reliance on the House Report on the ground that a Conference Report subsequent to the House Report adopted the *Soucie* test without enumerating specific FOIA agencies. *See Rushforth,* 762 F.2d at 1040. Nevertheless, then-Justice Rehnquist's opinion for the Supreme Court in *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), cited the 1974 House Report and described it as "indicating that the National Security Council is an executive agency to which the FOIA applies." *Id.* at 156, 100 S.Ct. at 971.

## II.

Because the court concludes that the NSC is not an agency for purposes of the Federal Records Act, it does not reach the issue raised in Armstrong's cross-appeal: whether the district court erred in holding that the Presidential Records Act rather than the Federal Records Act applies to NSC records "in the limited circumstance in which a high level official of the NSC acts solely to advise and assist the President." *Armstrong v. Executive Office of the President,* 877 F.Supp. at 706. In view of my conclusion in Part I that the NSC is an agency, I would reach this issue. To comply with one of our precedents and a decision of the Supreme Court, I would recognize an exception different from the one the district court suggested.

In *Ryan v. Department of Justice,* 617 F.2d 781 (D.C.Cir.1980), we found no basis in FOIA to distinguish between the Attorney General and the Department of Justice such that the Attorney General would not be an agency for FOIA purposes when acting solely in an advisory capacity to the President. *See id.* at 786–89. A few weeks later, in *Kissinger,* the Supreme Court held that, assuming the NSC were an agency to which FOIA applies, documents related to the activities of the Assistant to the President for National Security Affairs when "act[ing] in his capacity as a Presidential adviser, only[,]" were not subject to FOIA. *Kissinger,* 445 U.S. at 156, 100 S.Ct. at 971.

Although the holdings of *Ryan* and *Kissinger* may appear in tension with one another, they are easily reconcilable. Indeed, we followed *Ryan* in a case concerning the Government in the Sunshine Act, 5 U.S.C. § 552b, decided within a year of *Ryan* and *Kissinger, see Pacific Legal Found. v. Council on Envtl. Quality,* 636 F.2d 1259, 1264 (D.C.Cir.1980), and we have since discussed *Ryan*'s holding without suggesting that *Kissinger* called it into question, *see, e.g., Armstrong II,* 1 F.3d at 1295. The Supreme Court's holding in *Kissinger* was quite limited. The Court simply concluded that because the Office of the President is not part of the EOP and because Congress clearly wished to exclude from FOIA's coverage entities within the Office of the President—that is, the President's immediate personal staff and assistants—documents related to activities performed by a person with two positions, one in a FOIA agency and one in the Office of the President, while serving in his or her capacity in the Office of the President are not subject to FOIA. *See Kissinger,* 445 U.S. at 156, 100 S.Ct. at 971. Thus, a presidential assistant such as the Assistant to the President for National Security Affairs is not subject to FOIA while serving in that capacity even if he is subject to FOIA when acting in another capacity—for example, as a member of the NSC. *See id.* In contrast, *Ryan* involved the Attorney General, who, while often advising the President, does not hold an official position in the Office of the President as a presidential assistant. As we observed in *Ryan, see* 617 F.2d at 787–89, nothing in FOIA, in its legislative history, or in *Soucie,* which the legislative history purports to adopt, supports treating agencies or their parts as non-agencies whenever they perform advisory functions. Rather, Congress subjected to FOIA all EOP units except those whose *sole* functions are to advise and assist the President. *See Armstrong II,* 1 F.3d at 1295. Naturally, then, many entities subject to FOIA will also advise and assist the President.

The *Kissinger* holding thus addresses a limited situation: someone holding two positions, one in a FOIA agency and one in the Office of the President as a presidential assistant. Consistent with *Kissinger,* I would

therefore hold that records created or received by, and in the control of, any NSC member who also holds a separate position, such as in the Office of the President or the Office of the Vice President, while acting in his or her non-NSC capacity are not NSC records. Holding the NSC subject to FOIA and the Federal Records Act would thus not render subject to those statutes documents of the Assistant to the President for National Security Affairs, the Vice President, or other NSC members while acting in their non-NSC capacities (unless their non-NSC activities are otherwise subject to FOIA and the Federal Records Act). *Cf.* LIBRARY OF CONGRESS CONGRESSIONAL RESEARCH SERVICE, *supra,* at 18–19, *reprinted in Presidential Records Act Hearings* at 776–77 (reaching similar conclusion with respect to the Vice President). I think it is in keeping with *Kissinger,* however, to hold that the records of such officials are subject to FOIA and the Federal Records Act when those officials act in connection with the NSC to carry out or assist in carrying out NSC functions, even when those NSC functions are advising or assisting the President. Consistent with this court's decision in *Ryan* but contrary to the district court's holding, otherwise qualifying records in the control of NSC officials while acting in NSC capacities should be considered agency records for purposes of FOIA and federal records under the Federal Records Act, even if such officials hold high level positions within the NSC and even in circumstances in which such officials act to advise or assist the President.

### III.

My view that the NSC is an agency for purposes of FOIA and the Federal Records Act also requires that I consider the Government's argument that subjecting the NSC to the requirements of these statutes would violate constitutional separation of powers principles by intruding improperly into the President's exercise of his constitutional duties. The district court rejected this argument, as would I. Although we should avoid statutory constructions that would raise serious constitutional problems, *see Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct.

1392, 1397–98, 99 L.Ed.2d 645 (1988), none is raised by subjecting the NSC to FOIA and the Federal Records Act. In upholding a statute giving the Administrator of General Services the authority to take custody of former President Nixon's presidential papers and tape recordings, the Supreme Court noted that there was "abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." *Nixon v. Administrator of General Services,* 433 U.S. 425, 445, 97 S.Ct. 2777, 2791, 53 L.Ed.2d 867 (1977). Citing FOIA and the Federal Records Act, the Court stated that "[s]uch regulation of material generated in the Executive Branch has never been considered invalid as an invasion of its autonomy." *Id.*

The Government's request that we rule the NSC exempt from FOIA on the basis of broad, general allegations of unconstitutional intrusion has no foundation in precedent. We have suggested that such broad constitutional attacks are inappropriate if in particular contexts steps might be taken to avoid undue intrusions on the executive branch. In *Pacific Legal Foundation,* we rejected the Government's argument that applying the Government in the Sunshine Act to the Council on Environmental Quality would violate constitutional principles of separation of powers. We explained:

> The constitutional issues ... are posed in an abstract context that is inappropriate for their adjudication. It may be that by closing certain meetings, the Council could avoid possible constitutional problems. We apply the settled rule that federal courts "will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'"

*Pacific Legal Found.,* 636 F.2d at 1265 (quoting *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (internal citation omitted)). The record contains no evidence that the conduct of foreign affairs or national security preparedness under Presidents Ford, Carter, Reagan, and Bush, or indeed during the first year of the Clinton Administration, suffered from FOIA compli-

ance. Consistent with our approach in *Pacific Legal Foundation*, we could hold the NSC subject to FOIA with the understanding that the Government is free to raise another day constitutional objections to subjecting particular documents to the requirements of that statute. *Cf. Nixon*, 433 U.S. at 443, 97 S.Ct. at 2790 ("[I]n determining whether the [Presidential Recordings and Materials Preservation] Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." (citation omitted)).

Even were it appropriate for us to entertain the Government's broad attack on applying FOIA and the Federal Records Act to the NSC, the Government's case would be weak. Because FOIA exempts from its coverage materials classified "in the interest of national defense or foreign policy," 5 U.S.C. § 552(b)(1)(A), as well as "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency," § 552(b)(5), applying FOIA to the NSC presents little risk of improper intrusion into the President's exercise of his constitutional responsibilities. Indeed, the broad applicability of the national security exemption to NSC records likely explains the NSC's ready compliance with FOIA for nineteen years under Presidents Ford, Carter, Reagan, and Bush. In addition to the FOIA exemptions of national security materials and discovery-immune documents, my suggested exemption of certain documents of NSC officials holding separate positions, such as in the Office of the President or the Office of the Vice President, *see supra* Part II, provides further assurance that subjecting the NSC to the requirements of FOIA and the Federal Records Act will not intrude impermissibly into the President's interactions with his closest advisors. Under the holding I recommend, the President would be perfectly free to have FOIA-exempt interactions with his Assistant for National Security Affairs. Indeed, the

Office of Legal Counsel of the Department of Justice concluded in 1978 that subjecting the NSC to FOIA would not unconstitutionally intrude upon the President or the NSC:

> [D]ue to the nature of the work of the NSC and its staff it is clear that valid exemptions are available for the vast bulk of the material which constitutes NSC records....

> We have also considered whether NSC could raise a valid constitutional claim to general immunity from the FOIA, and we believe this possibility is very weak. Certain records of the NSC could, if necessary, be protected by a claim of executive privilege, but such a claim could not successfully be invoked to preclude Congress from opening to public view some NSC administrative records and other nonsensitive records to which the claim could not reasonably attach. Nor could it be shown on evidence now available that the Act's impact on NSC is so onerous that its ability to function in support of the President will be impaired.

2 Op. Off. Legal Counsel at 205 n.15, *withdrawn*, Memorandum from Walter Dellinger to Alan J. Kreczko (Sept. 20, 1993).

Presumably in recognition of Congress's authority to preserve documents of the United States Government, including the executive branch, the Government does not assert that the Presidential Records Act represents an unconstitutional intrusion upon the President's exercise of his constitutional duties. Consequently, the Government's challenge to application of FOIA and the Federal Records Act to the NSC must hinge upon the differences between the burdens imposed by the Presidential Records Act on the one hand and the Federal Records Act and FOIA on the other. In my view, the differences are insufficient to sustain the Government's constitutional claim.

First, in light of Congress's broad authority over executive branch documents, *see Nixon*, 433 U.S. at 445, 97 S.Ct. at 2791, little rests on the Federal Records Act's more demanding procedures to prevent destruction or unauthorized taking of documents, *see* 44 U.S.C. §§ 3303, 3303a. Leaving for another

day the possibility that executive privilege might entitle the President to keep or destroy *particular* documents, I think the Government has failed to offer any persuasive reason to hold that Congress is without power to subject nonsensitive NSC documents to the Federal Records Act.

Second, the Government argues that although the Presidential Records Act makes records available under FOIA procedures, it gives the President the power to specify a period of time, not to exceed twelve years, during which the materials will not be available, *see* 44 U.S.C. § 2204(a), thereby allowing the President while in office to avoid the supposedly intrusive effects of FOIA and the Federal Records Act. The risk of serious intrusion, however, is slight in view of existing FOIA exemptions and the President's ability to have non-NSC interactions with his Assistant for National Security Affairs and other NSC officials who hold separate, purely advisory, non-NSC positions. Furthermore, the timing differences between the Presidential Records Act and the Federal Records Act must be viewed together with other differences that make the former more burdensome than the latter in certain respects. In particular, under the Presidential Records Act, certain materials that are altogether exempt from FOIA—specifically, memoranda or letters not subject to discovery in litigation—are available under the Presidential Records Act using FOIA procedures. *See* 5 U.S.C. § 552(b)(5); 44 U.S.C. § 2204(c)(1).

Finally, the differences in the statutes' provisions for judicial review cannot sustain the Government's constitutional claim. Although judicial review is not available for compliance with the requirements of the Presidential Records Act as it is under the Federal Records Act, *see Armstrong v. Bush*, 924 F.2d 282, 297 (D.C.Cir.1991) (*Armstrong I*), judicial review of presidential guidelines describing which materials are presidential records is available even under the Presidential Records Act, *see Armstrong II*, 1 F.3d at 1292–94. The Government has offered no convincing rationale for holding unconstitutional the application of the judicial review provisions of FOIA and the Federal Records Act to the NSC—as opposed to other EOP units that advise and assist the President in addition to exercising substantial independent authority, or as opposed to other executive agencies involved in sensitive foreign affairs issues yet subject to FOIA, such as the Department of State and the Central Intelligence Agency.

## IV.

I would thus conclude that the NSC is an agency for purposes of FOIA and the Federal Records Act and that the Constitution presents no bar to subjecting the NSC to these statutes. I dissent.